William P. STANLEY, d/b/a Alaska Traffic
Consultants and Sea-Land Service,
Inc., Appellants,

v.

FABRICATORS, INC., Appellee.

No. 1061.

Supreme Court of Alaska.

Oct. 6, 1969.

Allen McGrath, Anchorage, for appellants.

Charles E. Tulin, Anchorage, for appellee.

Before NESBETT, C. J., and DIMOND, RABINOWITZ, BONEY and CONNOR, JJ.

NESBETT, Chief Justice.

We are required in this appeal to apply a number of provisions of the Uniform Commercial Code in determining the validity of two attachments of equipment. A detailed statement of pertinent facts must necessarily precede any discussion of the legal issues raised.

Appellee Fabricators, Inc., an Oregon corporation, leased certain dough manufacturing equipment to Pelton's Spudnuts, a Utah corporation located in Salt Lake City, Utah. Pelton's then subleased the same equipment to Foodcrafters, Inc., an Alaska corporation, which used the equipment to manufacture dough products for sale in the Anchorage area of Alaska.

The terms of the leases were identical except that the lease between appellee and Pelton's provided that if Pelton's exercised its option to cancel the lease because of an average decrease in demand for the manufactured products, that Pelton's should give a 30-day written notice and crate and ship the equipment to appellee at Seattle. Each lease stated that, "This is a contract of rental only and not a sale, conditional or otherwise." The period was for 60 months at a rental of $1,288 per month (preamble) and each lease stated that:

> Lessee shall have the option to purchase said equipment and personalty during the term of his lease for a cash price of $58,000.00 less 75% of all sums paid as rental herein.

During the terms of the leases and in February of 1968, Foodcrafters, Inc. lost its contract to supply the military base in Anchorage. On March 4, 1968, Lyndon Sikes, President of Foodcrafters, called in representatives of Sea-Land Sales of Alaska and informed them that the equipment was to be shipped back to the continental United States and requested their inspection and advice. The evidence established that Sea-Land Sales of Alaska, a corporation, was the exclusive sales agent for Sea-Land Service, Inc., a Delaware incorporated water carrier, and for Sea-Land Freight Service, Inc., a motor carrier. Sea-Land Sales shared the same office space and accounted to Sea-Land Service, Inc., but was not a subsidiary of that corporation. Sikes advised the Sea-Land Sales representatives that he was going out of business; that the equipment was leased from Pelton's and was to be returned to Seattle and possibly to Utah. Upon returning to their office the representatives of Sea-Land Sales informed Sea-Land Service, Inc. that Foodcrafters was going out of business and planned to ship the equipment collect.

On March 8, 1968, Sikes wrote to Pelton's advising them that Foodcrafters was

going out of business, enclosing estimates on crating from various moving companies and offering to assist in the crating for a fee. On March 15, 1968, Mr. Pelton came to Anchorage with his plant manager and engineer to take charge of dismantling and crating the equipment. Pelton employed A–1 Moving and Storage on Sikes' recommendation and worked with them with his assistants in dismantling and crating. Sikes kept the warehouse keys and occasionally assisted. The majority of the work had been completed by the time Pelton departed for Japan on March 17, leaving instructions with A–1 to complete the work. A–1 completed loading the equipment in the vans furnished by Sea-Land Service, Inc. at Foodcrafters' loading dock. The vans were picked up by Sea-Land Service, Inc. on March 19 and 22 as they. were filled. A–1's invoice listed Foodcrafters as shipper and their bill was sent to Sea-Land Service, Inc., and subsequently to Pelton's. Sea-Land Service, Inc. issued three straight non-negotiable bills of lading, one on March 19 and two on March 22. All were signed by Sikes on behalf of Foodcrafters as consignor with appellee Fabricators, Inc., Seattle, Washington, named as consignee.

On March 25, 1968, Sea-Land Service, Inc. filed suit against Foodcrafters for the sum of $900 alleging a debt past due and attached the Spudnut equipment which was then in its vans in its possession.

On April 10, 1968, Fabricators Inc. assigned "all of its right, title and interest" in its lease with Pelton's to National Oven Products of Washington. On April 23, 1968, Pelton's Spudnuts, Inc. wrote to Allen McGrath, Esq., counsel for appellant, explaining the lease arrangements, advising that the attached equipment belonged to Fabricators, Inc., enclosing copies of the leases, demanding release of the attachment, and advising that Sea-Land Service, Inc. would be held accountable for damages resulting from delay in mak-

ing shipment. On April 26, 1968, V. Burda, an attorney of Salem, Oregon, wrote to McGrath advising that the attached equipment was owned by appellee Fabricators, Inc.; that Foodcrafters had no interest in the property, and asking to be advised what further action was required in order to release the attachment.

On June 10, 1968, summary judgment was entered against Foodcrafters and in favor of Sea-Land Service, Inc. On June 17, 1968, Fabricators, Inc. filed with the state police and served McGrath with a "Notice of Third Party Claim" with an attached affidavit and copy of the Foodcrafters-Spudnuts lease. The district court set the time for hearing as August 15, 1968.

On July 1, 1968, McGrath, acting as attorney for appellant William P. Stanley, sued Foodcrafters in the superior court on an alleged past indebtedness and on July 11, 1968, caused the Spudnut equipment to be again attached. Fabricators, Inc. sought to challenge both attachments and entered the case by filing a complaint in intervention pursuant to Civil Rule 24. Hearing was also set for August 15, 1968, and on motion the cases were consolidated for hearing and trial on that date.

After hearing some ten witnesses during trial, the trial judge dissolved the attachments of Sea-Land Service, Inc. and William P. Stanley, holding, among other things, that the lease and the sublease were security interests within the meaning of the Uniform Commercial Code, AS 45.05.-002 to 45.05.794.

■ Although the agreements were called leases, the trial court was correct in finding that they were security agreements since they contained provisions conferring the right to purchase the equipment at any time during the 60 month terms of the leases for the sum of $58,000 less 75% of all sums paid as rental at the rate of $1,288 per month.[1] During the last month

---

1. AS 45.05.020(37) provides in part:
   [A]n interest in personal property or fixtures which secures payment or per-

formance of an obligation * * * unless a lease or consignment is intended as security, reservation of title un-

of the term total rents paid would be $77,-280. Seventy-five per cent of this amount would be $57,960. This indicates that the purchase option could be exercised for $40. Relative to $58,000, this is a nominal consideration and under clause B of AS 45.05.-020(37) demonstrates that the leases in question were in fact security agreements.[2] These facts bring the agreements within the rule of interpretation laid down in United Rental Equipment Co. v. Potts & Callahan Contracting Co.[3] which we adopt.

Appellants argue however, that the security interests thus created were never perfected because the interests never attached under AS 45.05.736 which provides that a security interest is perfected when it has attached and when all applicable steps required for perfection have been taken;[4] under AS 45.05.722 which provides that a security interest cannot attach until there is agreement that it attach and value is given and debtor has rights in the collateral;[5] and AS 45.05.020(3) defining "agreement" as the bargain of the parties in fact as found in their langauge or by implication from other circumstances including course of dealing or usage of trade or course of performance.[6]

■ We cannot agree. The agreements were entered into on December 1, 1966. Possession of the equipment was delivered to the lessee which transferred it to the sublessee Foodcrafters, which paid a monthly rental of $1,288 per month for a period of over 14 months until it was forced to cancel the agreement in accordance with an option contained therein. The fact that all of the parties entered into performance of the agreements on the date of execution and continued in faithful performance according to the terms of the agreements for a period of over 14 months is convincing proof that they intended that their respective interests attach upon execution of the agreements. This having been their intent, and value having been given by the lessor and sublessor by delivery of possession of the equipment and by the sublessee by the faithful payment of rental, and the sublessee having acquired a contingent equity in the equipment, it follows that the security interests of the parties had attached under the above quoted provisions of the Uniform Commercial Code.[7] The fact that the witness Burda was the only witness who testified that it was his intent that a security agreement be created is not

---

der the lease or consignment is not a 'security interest,' * * * whether a lease is intended as security is to be determined by the facts of each case; however, (A) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (B) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.

2. *See* Comment, Equipment Leasing Under the U.C.C., 13 U.C.L.A.L.Rev. 125, 130–34 (1965), and cases cited therein; 1 G. Gilmore, Security Interests in Personal Property 338 (1965).

3. 231 Md. 552, 191 A.2d 570 (1963).

4. AS 45.05.736 states:
   *When security interest is perfected; continuity of perfection.* (a) A security interest is perfected when it has attached and when all of the applicable

steps required for perfection have been taken. * * *

5. AS 45.05.722 states in part:
   *When security interest attaches; after-acquired property; future advances.* (a) A security interest cannot attach until there is agreement (§ 20(3)) that it attach and value is given and the debtor has rights in the collateral. * * *

6. AS 45.05.020(3) in part states:
   'agreement' means the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in chapter (§§ 28 and 64).

7. Spivak, Secured Transactions Under the Uniform Commercial Code 33 (1962), published by Joint Committee on Continuing Legal Education of the ABA and ALI; W. Warren, 3 California Commercial Law 41–49 (1966) ; Summers, Secured Transactions Under the Uniform Commercial Code, 42 Ore.L.Rev. 1, 8 (1962).

controlling in view of the fact that the agreements were unequivocally worded to create immediate rights and liabilities in the parties, and of the intent which can be otherwise implied from the circumstances of their subsequent conduct.

Appellants' next point is that appellee did not perfect its security interest by taking possession of the equipment.

It was conceded at trial that appellee did not file the financing statement provided for in the Uniform Commercial Code but it was contended by appellee that it had perfected its security interest in the equipment by assuming possession under the provisions of AS 45.05.734 which provides that a financing statement must be filed in order to perfect a security interest *except* when possession of the collateral is in the secured party.[8]

■ We decide that the trial court was correct in holding that appellee's security interest was perfected by possession of the collateral. Under the terms of the agreement between appellee and Spudnut, upon notification of Spudnut by Foodcrafters that it was exercising its option to cancel, Spudnut had the obligation to crate and ship the equipment to appellee at Seattle Washington.[9] As Pelton of Spudnut and his assistants, acting as the agents of Fabricators, assisted by A–1 Moving, dismantled and removed the equipment from Foodcrafters' building, to which Sikes of Foodcrafters retained the key,[10] and placed

it in Sea-Land's vans, the security interest of Fabricators became perfected under the provisions of AS 45.05.734(a) (1). By the time Pelton departed Anchorage on March 17, 1968, most of the equipment had been removed from the building and placed in vans. The balance of the removing and loading was performed by A–1 Moving at Pelton's direction and was completed by March 22, 1968. It follows from these facts that appellee's security interest was perfected at the time Sea-Land Service, Inc.'s attachment of March 25, 1968, and Stanley's attachment of July 11, 1968, issued.[11] The perfection of security interest thus attained was prior to and independent of that which might have been attained by the issuance of non-negotiable bills of lading on March 19 and March 22 which is discussed briefly later in this opinion.

Appellants' next point is that the trial court erred in holding that appellants had knowledge of appellee's security interest at the time they caused their attachments to issue.

We agree with the interpretation of the facts made by the trial court when it found:

\* \* \* Mr. Lyndon Sykes, [sic] president of Foodcrafters met with Mr. Rude and Mr. Hoehn of Sea-Land Sales of Alaska, Inc. on March 5, 1968 to discuss the shipping arrangements. According to Mr. Hoehn, Sea-Land Sales of Alaska, is not related in the corporate structure

---

8. AS 45.05.734 in pertinent part states:
    *When filing is required to perfect security interest; security interests to which filing provisions do not apply.* (a) A financing statement must be filed to perfect· all security interests except the following:
    (1) a security interest in collateral in possession of the secured party under § 740 of this chapter.
    *See also* AS 45.05.740 which states in part:
    *When possession by secured party perfects security interest without filing.* A security interest in letters of credit and advices of credit (§ 506(b) (1)), goods, instruments, negotiable documents, or chattel paper may be perfected by the secured party's taking possession of the

collateral. \* \* \* A security interest is perfected by posession from the time possession is taken without relation back and continues only so long as possession is retained unless otherwise specified in §§ 690–794 of this chapter. \* \* \*

9. Paragraph 11 of the agreement between appellee and Spudnut stated in part:
    \* \* \* upon said cancellation, and at Lessee's expense, crate the subject equipment and ship same to Lessor at Seattle, Washington.

10. *See* U.C.C. §˙9–305, c 2 and U.C.C. § 9–205, c 6.

11. *See* National Bank of Alaska v. Sprinkle, 3 N.C.App. 242, 164 S.E.2d 611, 617 (1968).

to Sea-Land Freight Service, Inc. and Sea-Land Service, Inc., the actual carriers who performed the shipping service. However, he testified that his concern acts exclusively as sales agent for the carriers named and for no others. Mr. Hoehn testified that he was advised by Mr. Sykes [sic] that the latter was going out of business and that he was moving the machinery out for the owners in Salt Lake City. Mr. Rude, district sales manager for Sea-Land Sales of Alaska, Inc., was present at the luncheon meeting with Mr. Sykes [sic]. He said that Mr. Sykes [sic] stated that the equipment was leased and that it was going to be forwarded to Mr. John Urban of Auburn, Washington.

At the luncheon meeting, there was what appears to have been a comprehensive discussion of the details of the shipment * * *

Mr. Sykes [sic] testified that he had informed Mr. Hoehn and Mr. Rude of the property interest in the equipment which was the subject of the shipment. While Mr. Hoehn and Mr. Rude were not employees of Sea-Land Service, Inc., the attaching creditor, they were employees of Sea-Land Sales of Alaska, Inc., a corporation not owned by the carrier. However the manner in which Sea-Land Sales of Alaska conducted its business, with apparent consent of the carrier, that is, use of the trade name, use of office space in the carrier's building, telephone listing with a group of related companies, and the fact that the sole business of Sea-Land Sales of Alaska, Inc., is the sale and promotion of contracts for the carriage of merchandise for the carrier constitutes such an agency relationship that notice to the

sales company must be held to constitute notice to the carrier, or at the very least, the carrier is estopped from denying the agency relationship * * *

Thus, I find that, through notice given by Mr. Sykes, [sic] and by taking possession of goods by Mr. Pelton, petitioner acquired a perfected security interest prior to plaintiff's attachment * *

■ AS 45.05.732(a) (2) provides that an unperfected security interest is subordinate to the rights of a person who becomes a lien creditor without knowledge of the security interest and before it is perfected.[12] Since Sea-Land Service, Inc. did receive notice on March 5, 1968, of Pelton's interest in the equipment through its agent Sea-Land Sales, it follows that appellee's security interest was not subordinate to Sea-Land Service, Inc.'s attachment of March 25, 1968.

■ Appellant also argues that a lien creditor's knowledge of a secured party's interest has significance only if the secured party subsequently perfects its security interest. We do not agree. The wording of AS 45.05.732(a) (2) seems to plainly provide that an unperfected security interest shall be superior to the interest of a lien creditor acquired with knowledge of the security interest. It appears to be the intent of the section that only when the lien creditor becomes such without knowledge of the security interest and before the security interest is perfected shall the unperfected security interest be subordinate.[13]

Appellant argues that the fact that Sea-Land Service, Inc. may have had "notice" of an existing security interest in the equipment through its agent Sea-Land Sales, is not sufficient to subordinate its

12. AS 45.05.732(a) (2) in pertinent part states:

Persons who take priority over unperfected security interests; 'lien creditor.' (a) * * * an unperfected security interest is subordinate to the rights of * * * (2) a person who becomes a lien creditor without knowledge of the

security interest and before it is perfected * * *.

13. See Bloom v. Hilty, 427 Pa. 463, 234 A.2d 860, 861–64 (1967) and Felsenfeld, Knowledge as a Factor in Determining Priorities Under the Uniform Commercial Code, 42 N.Y.U.L.Rev. 246, 255–56 (1967).

lien since AS 45.05.732(a) (2) requires that it have had "knowledge" of the unperfected security interest before it could be held to be subordinate thereto. Appellant relies upon AS 45.05.020(25) which states that

> a person has 'notice' of a fact when (A) he has actual knowledge of it; (B) he has received a notice or notification of it; or (C) from all the facts and circumstances known to him at the time in question he has reason to know that it exists; a person 'knows' or has 'knowledge' of a fact when he has actual knowledge of it.

and upon AS 45.05.020(27) which states

> notice, knowledge, or a notice or notification received by an organization is effective for a particular transaction from the time when it is brought to the attention of the individual conducting that transaction, and in any event from the time when it would have been brought to his attention if the organization had exercised due diligence.

in arguing that since "knowledge" means actual knowledge and since the Sea-Land Sales representatives did not actually advise representatives of Sea-Land Service, Inc. of the unperfected security interest, it did not have "knowledge" within the meaning of AS 45.05.732(a) (2).

Appellant cites the official comment of the drafters of the Uniform Commercial Code on what is AS 45.05.020(27) as follows:

> 27. New. This makes clear that reason to know, knowledge or a notification, although 'received' for instance by a clerk in Department A of an organization is effective for a transaction conducted in Department B only from the time when it was or should have been communicated to the individual conducting that transaction.

■ What appellant *overlooks* is that "notice," as well as "knowledge," as defined by AS 45.05.020(25), include "actual knowledge" and that during the conversation between representatives of Sea-Land Sales and Sikes of Foodcrafters, Sikes directly informed them that the equipment was owned by Pelton, was leased, and would have to be returned to Seattle or Utah. This amounted to the communication of "actual knowledge" to Sea-Land Sales which was "knowledge" as well as "notice" under AS 45.05.020(25). The knowledge thus obtained by agents of Sea-Land Service, Inc. was of considerable importance in evaluating the payment responsibility of the consignee and should have been communicated to the principal corporation immediately upon their reporting on the results of their call. The fact that the agents only passed on "limited information" to their principal does not prevent imputing the "knowledge" they obtained to their principal.

Appellant next argues that the trial court erred in holding that appellant Stanley had knowledge of appellee's security interest at the time of his July 11, 1968, attachment.

No error was committed. The letter of April 23, 1968, from Pelton's Spudnuts to Allen McGrath, Esq., who was then counsel for Sea-Land Service, Inc. and later counsel for Stanley, enclosed a copy of the sublease between Pelton's and Foodcrafters and explained the lease and sublease arrangement between the parties. The letter pointed out that Foodcrafters had no further interest in the property and that it was owned by appellee. The letter of April 26, 1968, from Burda to McGrath likewise explained the lease arrangement and specifically pointed out that the equipment was owned by appellee and that Foodcrafters had no interest in it.

■ The trial court was correct in holding that the knowledge of the ownership of the equipment and the financial relationship of the parties acquired by McGrath as attorney for Sea-Land Service, Inc. was of such a nature and was acquired under such circumstances that it could have been communicated to Stanley without violating the attorney-client rela-

tionship which existed between McGrath and Sea-Land Service, Inc., and that such knowledge would therefore be imputed to Stanley. Since Stanley had implied, if not actual, knowledge of appellee's security interest in the equipment at the time his July 11, 1968, attachment issued, the attachment was not valid.

Since the matter has not been adequately briefed we shall not attempt to attach significance to the fact that on April 10, 1968, appellee had assigned its interest in its lease with Pelton's to National Oven Products of Washington.

Although not urged at the trial, appellee has urged on appeal that its security interest was perfected when Sea-Land Service, Inc. issued non-negotiable straight bills of lading while the equipment was in its possession.

Appellee relies upon AS 45.05.738(c) which provides among other things that a security interest in goods in the possession of a bailee other than one who has issued a negotiable document for the goods is perfected by the issuance of a document in the name of the secured party.[14]

There is no doubt but that Sea-Land Service, Inc. was a bailee within the definition of that term by AS 45.05.534(a) (1) which states:

(1) 'bailee' means the person who by a warehouse receipt, bill of lading, or other document of title acknowledges possession of goods and contracts to deliver them * * *.

when the equipment in question was loaded in its vans and Sea-Land Service, Inc. issued the non-negotiable bills of lading of March 19 and 22, 1968, naming appellee Fabricators, Inc. as consignee, appellee's security interest would thereby have become perfected if it had not in fact already been perfected as the equipment was removed from Foodcrafters' building and placed in Sea-Land's vans which was accomplished by March 22, 1968.[15]

■ The last point to consider is appellants' contention that appellee's conduct between the date of the Sea-Land Service, Inc. attachment on March 25, 1968, and the attachment by appellant William P. Stanley, was a dishonest attempt to exert what had been a secret lien in order to defeat a valid attachment and that it did not act in "good faith" as defined in AS 45.-05.020(19). Appellants have not indicated the statutory origin of the claimed obligation of good faith owed to them by appellee. AS 45.05.029(19) merely defines "good faith" as "honesty in fact in the conduct or transaction concerned." AS 45.05.024 states:

Every contract or duty within this chapter imposes an obligation of good faith in its performance or enforcement.

---

14. AS 45.05.738(c) states:

A security interest in goods in the possession of a bailee other than one who has issued a negotiable document for the goods is perfected by issuance of a document in the name of the secured party or by the bailee's receipt of notification of the secured party's interest or by filing as to the goods.

15. The parties have not briefed and we shall therefore not attempt to consider the question of whether Pelton's assumption of possession of the equipment on March 15, 1968, in response to Foodcrafters' notice of option to cancel the agreement, did not render moot any further consideration of the question of a security interest under the provisions of AS 45.05.786 which states:

Unless otherwise agreed, a secured party has on default the right to take possession of the collateral. In taking possession, a secured party may proceed without judicial process if this can be done without breach of the peace or may proceed by action. If the security agreement so provides, the secured party may require the debtor to assemble the collateral and make it available to the secured party at a place to be designated by the secured party which is reasonably convenient to both parties. Without removal, a secured party may render equipment unusable, and may dispose of collateral on the debtor's premises under § 788 of this chapter.

AS 45.05.020(11) defines a "contract" as "the total legal obligation which results from the parties' agreement." AS 45.05.-020(3) defines "agreement" as "the bargain of the parties in fact as found in their language or by implication from other circumstances * * *."[16] Appellants contend that appellee's bad faith was demonstrated by its failure before trial to specifically claim a security interest rather than under the general terms of its lease. A study of the record does not indicate that appellee had had any intention of misleading appellants. We find no violation of the statute in the facts of this case.

The judgment below is affirmed.

---

16. *See also* AS 45.05.040(a) (2) which states: 'good faith' in the case of a merchant means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade.