In re TULSA PORT WAREHOUSE COMPANY, INC.; Mid-America Packing Specialists Division, a Division of the Tulsa Port Warehouse Company, Inc., Bankrupt.

James ADELMAN, Trustee, Plaintiff-Appellee,

v.

GENERAL MOTORS ACCEPTANCE CORPORATION, and Chuck Naiman Buick Company, Defendants-Appellants.

Bankruptcy No. 79–C–354–BT.

United States District Court, N. D. Oklahoma.

May 28, 1980.

Mickey D. Wilson, Tulsa, Okl., for plaintiff-appellee.

William C. Kellough, Blackstock, Joyce Pollard, Blackstock & Montgomery, Tulsa, Okl., for defendants-appellants.

## OPINION

BRETT, District Judge.

Defendants-Appellants, General Motors Acceptance Corporation (GMAC) and Chuck Naiman Buick Company (Naiman), appeal to this Court for reversal of judgment entered by the Bankruptcy Court on March 13, 1979. That judgment and the accompanying Findings of Fact and Conclusions of Law held that leases involving four automobiles were as a matter of law leases intended for security and thus subject to the perfection requirements of the Uniform Commercial Code. It was further held that since these security agreements had not been perfected as required by the U.C.C., the interest of the plaintiff trustee in bankruptcy in the subject automobiles or the proceeds is superior to that of the general creditor defendants, GMAC and Naiman.

After carefully considering the substance of the agreements and the applicable law, the Court finds that the judgment of the Bankruptcy Court should be affirmed.

During 1976 and 1977, the Bankrupt in this case entered into four separate "Non-Maintenance Lease Agreements" with Naiman, which were assigned to GMAC. The four agreements are identical in all pertinent respects.

The leases here involved are "open-end" leases which are distinguished from "closed-end" leases primarily by the method of termination as provided in Items 30 and 31 of the agreements.[1] The agreements provide that in a closed-end lease, at the end of the

---

1. "30. NORMAL LEASE TERMINATION AT THE END OF THE SCHEDULED TERM

(a) Open-End Lease—Immediately upon the termination of this lease, the lessee shall return the vehicle to the Lessor at the address hereinbefore mentioned and Lessor shall sell the vehicle at wholesale in such commercially reasonable manner as Lessor

lease term, the lessee returns the vehicle to lessor and the obligations of both come to an end. Further, if the lease is terminated prematurely, the lessee is responsible for the unpaid rental with the vehicles being returned to lessor.

In an open-end lease, the termination provisions are somewhat more complex. Here, at the end of the lease term, the lessee is to return the vehicles to the lessor. However, unlike the situation involving a closed-end lease, the relationship between

shall determine. If the net amount received from such sale is more than the Agreed Depreciated Value of Vehicle (ITEM 5), Lessor shall pay such excess to the Lessee. If the net amount received from such sale is less than the Agreed Depreciated Value of Vehicle (ITEM 5) the total amount of such deficiency shall be paid by Lessee upon demand to the Lessor with the understanding that only if this vehicle is leased primarily for personal, family, household or agricultural use and only if this vehicle is returned at the end of the full lease term, that the maximum amount of such deficiency shall not exceed two times the amount of the Fixed Monthly Rental Charges (ITEM 7). This deficiency limitation does not apply to charges for damages to the leased vehicle or for other default nor does it apply to vehicles leased for business or commercial use. The 'net amount' received from the sale of the vehicle as used in this lease shall be defined as the sale price of the vehicle less all direct expenses of the Lessor incurred in selling, preparing and holding the vehicle for sale and less all debts incurred by Lessee which if not paid, might constitute a lien on the vehicle or a liability to the Lessor.

(b) Closed-End Lease—Immediately upon termination of this lease the Lessee shall return the vehicle to the Lessor at the address hereinbefore mentioned in good condition and if all terms and conditions of this lease have been complied with, neither party shall have any further obligation to the other.

31. PREMATURE LEASE TERMINATION: It is intended that this lease will run for the full term specified on the preceding page, however, should unforeseen developments arise, the Lessee may elect, at his option, to terminate at any time after the first six months providing that Lessee is not in default, by giving the Lessor at least 30 days prior written notice of his intention and by return of the vehicle to the Lessor at the address hereinbefore mentioned. In the event of premature termination, if insurance has been procured by or provided by the Lessor, the provisions of the insurance policy(s) will define the Lessee's liability for insurance premiums. Lessee liability to the Lessor for vehicle rentals in the event of premature lease termination is defined according to the type of lease as follows:

(a) Premature Termination Liability—Open-End Lease: The Cash Down Payment (ITEM 2) together with the Net Trade-In (ITEM 3) constitute prepaid depreciation which will be credited against the Original Value of the Vehicle (ITEM 1) at lease inception. The portion of the Total Amount of Fixed Monthly Rentals NOT To Be Credited Against Original Value (ITEM 6A) will be earned by the Lessor according to the "Rule of 78." The earned portion of the Total Amount of Fixed Monthly Rentals NOT To Be Credited Against Original Value will be subtracted from the sum of all the Fixed Monthly Rental Charges (ITEM 7) paid by the Lessee to the Lessor up to the point of lease termination to establish the amount of the depreciation credit against the Original Value of the Vehicle (ITEM 1) to which the Lessee will be entitled based upon the Fixed Monthly Rental Charges which he has paid. The depreciation credit calculated in this way together with the prepaid depreciation based upon both the Cash Down Payment (ITEM 2) and the Net Trade-In (ITEM 3) will be subtracted from the Original Value of the Vehicle (ITEM 1) to establish the Maximum Amount of Open End Lessee Liability in the event of premature lease termination. The Lessor shall sell the vehicle at wholesale in such commercially reasonable manner as Lessor shall determine. If the net amount received from such sale is more than the Maximum Amount of Open End Lessee Liability in the event of premature lease termination as set forth in this paragraph, Lessor shall pay such excess to Lessee. If the net amount received from such sale is less than the Maximum Amount of Open End Lessee Liability in the event of premature lease termination, the total amount of such deficiency shall be paid by Lessee upon demand to Lessor.

(b) PREMATURE TERMINATION LIABILITY—CLOSED–END LEASE: In the event of premature termination of a closed-end lease the Lessee shall be responsible for an amount equal to the total amount of unpaid Fixed Monthly Rental Charges (ITEM 7A) for the remaining months of this lease and this total amount shall be payable according to the original payment schedule except that if the Lessee is in default with respect to the originally agreed upon payment schedule this total amount will become due and payable to the Lessor upon demand."

lessor and lessee does not come to an end. Rather, the lessor, upon return of the vehicle, must sell the vehicle, and if the net amount received from the sale is greater than the predetermined "agreed depreciated value", lessor must pay any excess to the lessee. On the other hand, if the net amount received is less than the "agreed depreciated value", lessee must pay to lessor the deficiency.

In case of premature termination, by default or choice of lessee, the lessee must also return the vehicle and the lessor must sell it. However, the "agreed depreciated value" is adjusted to determine the "maximum amount of open end lessee liability," and then lessee will either receive a refund or be required to pay a deficiency, based upon the net sale price. The "net amount" in either event is defined as the sale price of the vehicle less costs to the lessor in connection with the sale and all debts incurred by lessee which might constitute a lien on the vehicle or a liability to the lessor.

The face of each agreement contains a section entitled "Lessee Liability Disclosure: (must be completed if this is an open-end lease)." In this section, the amounts for which lessee will be responsible are computed. The computation begins with the Original Value of the vehicle, from which is deducted any Cash Down Payment and or net trade-in, to arrive at the Net Original Value. In these particular leases, the original value and the net original value are the same, since there is no down payment or trade-in. The next item is designated Agreed Depreciated Value, and is an estimate of the value of the vehicle at the end of the lease term. This Agreed Depreciated Value is deducted from the Net Original Value, and the difference is designated as Total Amount of Fixed Monthly Rentals for the Full Lease Term to be Credited Against Original Value. The final item (numbered 6A) in the section is Total Amount of Fixed Monthly Rentals Not to be Credited Against Original Value.[2] There is no explanation of the method by which Item 6A is computed.

Items 6 and 6A are then totaled and sales tax added to arrive at total monthly charges for lease term. This amount is then divided by the number of months of the lease term to arrive at the monthly rental payment.

Determination of the nature of these agreements must begin with Title 12A O.S. § 1–201(37), which defines the term "security interest."[3] This section clearly states

---

**2.** A representative example of the computations in this section is taken from defendants' Exhibit I:

"1. ORIGINAL VALUE OF VEHICLE .......1 $9038

2. CASH DOWN PAYMENT Credited Against Original Value (Prepaid Depreciation) ...2 $0

3. NET TRADE–IN Credited Against Original Value (Prepaid Depreciation) (Complete for both open and closed-end leases) ........3 $0

4. NET ORIGINAL VALUE (Item I less Items 2 and 3) ...... ................... . 4 $9038

5. AGREED DEPRECIATED VALUE OF VEHICLE at the completion of the originally scheduled term of this lease. The agreed depreciated value of the vehicle will be compared to the net amount received from the sale of the returned vehicle at wholesale upon lease termination to establish the amount of Lessee deficiency or rebate. The MAXIMUM LESSEE LIABILITY for deficiency shall be established in accordance with the NORMAL LEASE TERMINATION provisions on the reverse side. In the event of default or premature lease termination the MAXIMUM LESSEE LIABILITY shall be determined in accordance with the DEFAULT or PREMATURE LEASE TERMINATION provisions on the reverse side ..... ......... .................5 $5000

6. TOTAL AMOUNT OF FIXED MONTHLY RENTALS FOR THE FULL LEASE TERM TO BE CREDITED AGAINST ORIGINAL VALUE (Depreciation Included in Fixed Monthly Rental Charges—Item 4 less Item 5)........... .. . .. ............6 $4038

6A. TOTAL AMOUNT OF FIXED MONTHLY RENTALS NOT TO BE CREDITED AGAINST ORIGINAL VALUE (Item 7A less Item 6) ...... ..... .........6A $1374"

**3.** This section provides:

"'Security interest" means an interest in personal property of fixtures which secures payment or performance of an obligation. The retention or reservation of title by a seller of goods notwithstanding shipment or delivery to the buyer (Section 2–401) is limited in effect to a reservation of a 'security interest'. . . . Unless a lease or consignment is intended as security reservation of title thereunder is not a 'security interest' but a consignment is in any event subject to the provisions on consignment sales (Section 2–326). *Wheth-*

that whether a particular lease is intended for security is to be determined by the facts of each case. The section then goes on to provide guidelines in the case of a lease with an option to purchase. However, the leases involved here do not include options to purchase, so the guidelines referring to such options and the tests concerning nominal or substantial consideration are not applicable.

■ Neither is the absence of an option to purchase controlling. As the Court observed in *In The Matter of Tillery,* 571 F.2d 1361 (5th Cir. 1978):

> "Just as the *inclusion* of an option to purchase *does not in* and of itself make the lease one intended for security; so also, the *exclusion* of such an option does not ipso facto make it a 'pure lease.'"

■ Whether an agreement is a lease intended for security is dependent on the intent of the parties as ascertained from the terms of the instrument. The fact that these agreements are denominated as leases is not a controlling factor. *Stanley v. Fabricators, Inc.,* 459 P.2d 467 (Alaska 1969).

■ It is substance and not form which is decisive in determining whether an agreement is intended to create a security interest. *In Re A & T Kwik-N-Handi, Inc.,* 13 UCCRS 960 (D.C.Ga.1973). Therefore, the Court must analyze the contract to determine what rights and obligations have been created. *Uniroyal, Inc. v. Michigan Bank, N.A.,* 12 UCCRS 745 (Mich.1972). In other words, the real test is what the contract actually does, rather than what it superficially says.

■ A careful look at these agreements reveals that they are indeed leases intended for security. The only interests retained by the lessor are naked title, plus the right to receive the purchase price and an amount which is apparently interest.

Under these agreements the parties have consented at the outset how much lessor is to realize from the sale of the vehicles. He is to receive from the lessee the agreed monthly payments which include interest. The remainder of the price is then obtained by sale of the vehicle at termination.

It is the lessee who has the real interest in the disposition of the vehicle. Lessor is *assured by the agreement of the lessee* that he will receive the original agreed value of the vehicle—no more and no less—plus an amount that is apparently interest. (Emphasis supplied). In the case of premature termination, the lessor is still assured that he will receive the original value of the vehicle plus interest, except that the interest is reduced by the "Rule of 78's." This Rule of 78's is a method used to compute interest earned by a lender when a loan, set up on monthly installments, is paid off prematurely. *Bone v. Hibernia Bank,* 493 F.2d 135 (9th Cir. 1974).

It is true that the lessee probably will not pay the full purchase price himself because the termination value will probably be paid by a third party purchaser. However, it is lessee who will pay any deficiency or receive any surplus. The practical effect of this arrangement is the same as if lessee purchased the car, then sold it two or three years later and used the proceeds to pay off the note. This similarity is strengthened by the fact that all expenses incurred by lessor in selling the vehicles are to be borne by lessee.

■ One of the characteristics of a lease is that, at the end of the term, the owner has the absolute right to retake control and use the property. *Transamerica Leasing Corp. v. Bureau of Revenue,* 80 N.M. 48, 450 P.2d 934 (1969). In other words, the owner, after the lease term has expired, can do as he pleases with his property. In the leases involved here, however, that is not the case. These agreements require the lessor to sell

---

er a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security." (Emphasis supplied).

the vehicles in a commercially reasonable manner. This lends support to the conclusion that, even after the lease term has ended, the lessor is not the owner but acting as a representative of the lessee.

While it is true that these leases contain no option to purchase, lessee can, if he wishes, purchase the vehicle for the amount agreed upon at the outset. The lessee will pay, and the lessor will receive, the original agreed value plus interest, and this is true even if lessee must bid more than the agreed depreciated value, since any excess he may have to bid will be refunded under the termination provisions.

Finally, these agreements contain other indicia of a sale, indicating that they are leases intended for security.[4] Lessee must

4. These provisions are as follows:

24. INSURANCE: Lessee shall at all times and at his sole expense obtain and maintain an insurance policy on the vehicle which provides liability insurance in the amounts of at least $100,000 for any one person for injury or death, $300,000 for any one accident for personal injury or death and $25,000 for property damage if the leased vehicle is an automobile or $50,000 for property damage if leased vehicle is a truck, and Uninsured Motorist Coverage. Such coverage is to be provided by a policy from an insurance company satisfactory to Lessor and the policy shall also name the Lessor as additional insured.

Lessee shall at all times and at his sole expense also keep vehicle insured against all loss, damage or destruction due to fire, theft and physical damage. The deductible amount is not to exceed $100 for collision nor $50 for comprehensive coverage. Such coverage is to be provided by a policy from an insurance company satisfactory to Lessor and the policy shall contain a standard loss payable clause under which such insurance shall be payable in case of loss to Lessor and General Motors Acceptance Corporation as their interests may appear.

Lessee shall provide and pay for any other insurance or bond that may be required by any governmental authority as a condition to, or in connection with, Lessee's use of the vehicle.

Lessee shall furnish Lessor with satisfactory evidence of the above insurance.

If any mutually approved carrier refuses to issue any insurance herein required or if the Lessee fails to maintain such insurance, or if such insurance is cancelled or suspended, the Lessor, at his option, may terminate this lease and take possession of the vehicle which will be disposed of as hereinafter provided, or the Lessor may elect to attempt to procure such insurance for the Lessee. In the event that the Lessor procures such insurance the Lessee agrees to pay as an additional part of the obligation under this lease agreement an additional charge equal to the premium together with interest.

In the event the vehicle is involved in an accident, damaged, stolen or destroyed by fire, the Lessee will notify Lessor, in writing, within 24 hours and will also comply with all terms and conditions entered in the insurance policies. The Lessee agrees to cooperate with the Lessor and the insurance companies in defending against any claims or actions resulting from the Lessee's operation or use of the vehicle.

This vehicle shall not be used by any person, in any manner, or for any purpose that would cause any insurance herein specified to be suspended, cancelled, rendered inapplicable or increased in cost.

25. MAINTENANCE AND REPAIRS: Lessee shall pay for all maintenance and repairs to keep vehicle in good working order and condition and will maintain the vehicle as required to keep the manufacturer's warranty in force. The vehicle will be returned at the end of the lease period in good condition, reasonable wear and tear excepted.

26. REGISTRATION, LICENSE, EXPENSES, FEES, TAXES AND INSPECTION: Lessee shall pay all expenses incurred in the use and operation of the vehicle, including license, registration and title fees, gasoline, oil, antifreeze, repairs, maintenance, tires, storage, fines, inspections, assessments, sales or use taxes, if any, and all other taxes as may be imposed by law from time to time, except those levied on the net income of the Lessor. Lessee will reimburse and hold Lessor harmless for any and all amounts Lessor may pay in satisfaction, release or discharge thereof. Lessee shall permit Lessor and its designees to inspect the vehicle at reasonable times, places and intervals.

\* \* \* \* \* \*

28. VEHICLE USE: Lessee shall keep vehicle free of all taxes, liens and encumbrances and any sum of money that may be paid by Lessor in release or discharge thereof, including legal costs, shall be paid on demand by Lessee. Lessee shall not use vehicle illegally, improperly or for hire and shall not remove vehicle outside the United States or Canada.

Vehicle shall not be altered, marked or additional equipment installed without the prior written consent of Lessor, in which case Lessee will bear the expense of restoring vehicle to its original condition.

29. TITLE: Lessee acknowledges that this is an agreement to lease only and title to the vehicle shall at all times remain in Lessor. Lessee covenants and agrees not to assign this lease without the prior written consent

pay all operating, maintenance, and repair costs and he must pay all taxes and license fees. Lessee must purchase insurance satisfactory to lessor which contains a loss payable clause in favor of lessor and GMAC "as their interests may appear." Lessee is required to indemnify lessor against "all losses, damages, injuries, claims, demands and expenses arising out of the condition, maintenance, use or operation of the vehicle." Finally, the agreement may be terminated by lessee upon 30 days written notice, thus activating the premature termination provisions. Lessor, however, may only terminate the agreement upon default by lessee.

While neither party has discussed it, and there is no evidence it was ever operative, the Court notes that there is an Excess Mileage Charge paragraph in each of the agreements. This charge is 6 cents per mile for each mile the automobile is driven more than an average of 15,000 miles per year. This is one indicia that might support a finding these are true leases but the excess mileage paragraph is inexplicable in the context of the whole agreement.

The Bankruptcy Court, in finding that these instruments were leases intended for security, relied on *In the Matter of Tillery*, 571 F.2d 1361 (5th Cir. 1978), in which the order of the Bankruptcy Judge was adopted by the Court of Appeals. The leases involved in *Tillery* were very much like those involved here; in fact they were almost identical in all important respects. There, the Bankruptcy Court found:

"The termination formula recognizes the equity of the 'Lessee', in the vehicle because he is required to bear the loss or receive the gain from its wholesale disposition. In addition, his equity extends to the retail value of the vehicle which, in effect, he is required to pay under the contract. If the contract runs through the completion of the initial term (36 months) the 'Lessor' will have received through monthly 'rental payments' the sum of $8,611.20 and is still entitled to receive the sum of $3,570.00 by direct payment from the 'Lessee' and/or from disposition of the vehicle. This constitutes a total payment of $12,181.20; and although no evidence was presented as to

of Lessor nor do any act to encumber, convert, pledge, sell, assign, re-hire, lease, lend, conceal, abandon, give up possession of, or destroy the vehicle.

32. DEFAULT: In any of the following default events, viz, (1) default in any payment due hereunder, (2) failure to comply with any of the terms or conditions hereof, (3) a proceeding in bankruptcy, receivership or insolvency is instituted by or against the Lessee or his property or the Lessee makes an assignment for the benefit of creditors, or (4) the Lessee fails for any reason to comply with the insurance requirements of the lease or said required insurance is cancelled prior to the expiration of this lease, the Lessor shall have the right, at his election to sue Lessee for damages or to terminate the lease and in such event Lessor may take immediate possession of the vehicle without demand and for this purpose may enter upon the premises where the vehicle may be and remove it. Lessor may take possession of any property in the vehicle at time of repossession, if such other property may be therein, and hold same for Lessee at Lessee's risk without liability on the part of the Lessor, Lessee to be liable for any charges for storing such property incurred by Lessor.

In the event of repossession, the Lessor shall have the rights and remedies as provided and permitted by law and shall dispose of the vehicle in such commercially reasonable manner as Lessor shall determine. The maximum amount of Lessee liability and any associated deficiency or rebate shall be established on the same basis as would have been applied had the Lessee himself voluntarily elected to terminate the lease prematurely as of the date of repossession as herein provided for in the PREMATURE LEASE TERMINATION provisions. Any deficiency or rebate, so determined for open or closed end leases will be in addition to any excess mileage charges, damages, or other remedies herein provided.

If it is necessary to employ the services of any attorney or incur expenses in enforcing this Lease Agreement, the Lessee shall pay to the Lessor all such expenses and court costs, in addition to all other sums due Lessor including reasonable attorney's fees.

33. INDEMNIFICATION: Lessee agrees that the rentals shall not be subject to any defenses, set-off, counterclaims or recoupment and agrees to indemnify and hold harmless Lessor and its assignees and employees from all losses, damages, injuries, claims, demands and expenses arising out of the condition, maintenance, use or operation of the vehicle.

the retail sales price of the vehicle on April 12, 1974, it appears to be reasonable to presume that the total amount received would constitute the retail price of the vehicle plus a substantial interest charge for financing the transaction over a period of three (3) years. Mathematically, this same result would occur at an earlier termination."

The Court then observed:

"An equity in the 'Lessee' is one of the distinctive characteristics of a lease intended for security. As stated by Judge Hiller in the case of *In Re Royer's Bakery, Inc.*, (ED—Pa., 1963) 1 UCC Rep. 342:

"' . . . Whenever it can be found that a lease agreement concerning personal property contains provisions the effect of which are to create in the lessee an equity or pecuniary interest in the leased property the parties are deemed as a matter of law to have intended the lease as security within the meaning of Sections 9–102 and 1–201(37) of the Uniform Commercial Code."

The Court found in *Tillery* the instruments as a whole created rights and obligations indicating a sale rather than a true lease, and therefore were leases intended as security.

Naiman and GMAC argue strongly that *Tillery* was incorrectly decided. These leases, they say, create not an equity in the property, but only a secondary liability in connection with the use of the property. They emphasize the requirement that lessee return the vehicles to the lessor, and contend that any obligation of lessee beyond the lease term is an obligation to pay for the use of goods. These arguments are unpersuasive. While it is true that lessee's right to receive a refund or obligation to pay depends on the price received at sale, once the car is sold lessee's right or obligation becomes unconditional in keeping with the previously agreed upon price.

GMAC and Naiman also argue that *Tillery* is directly in conflict with the tests for determining whether a lease is intended for security as adopted by the Tenth Circuit and by many other courts. *Percival Construction Co. v. Miller and Miller Auctioneers, Inc.*, 532 F.2d 166 (10th Cir. 1976); *Crest Investment Trust, Inc., v. Atlantic Mobile Corp.*, 252 Md. 286, 250 A.2d 246 (1969); *Citicorp Leasing, Inc. v. Allied Institutional Distributors, Inc.*, 454 F.Supp. 511 (W.D.Okl.1977). These cases, it is argued, establish that these are "true leases", because the "option" price at the end of the term is greater than 25% of the original purchase price, *In Re Alpha Creamery Co., Inc.*, 4 U.C.C.R.S. 794 (W.D.Mich.1967); *Percival Construction Co. v. Miller and Miller Auctioneers, Inc., supra*, and is also approximately the same as market value at the end of the lease term. The problem with applying those tests, however, is that the leases involved in those cases all contained options to purchase. The word option indicates a choice, that is, the lessee can choose whether to purchase the article or to return it to the lessor. In fact, one of the tests adopted by the Courts is whether the terms of the lease and option are such that the only sensible course for the lessee at the end of the term is to exercise the option. *Citicorp Leasing, supra.* In other words, where the terms of the agreement effectively leave the lessee no choice, then the agreement will be found to be a lease intended for security.

In this case, there is no "option." The rights and obligations of the parties are unconditional. Therefore, the tests for determining the effect of an option to purchase are inapplicable.

It is noteworthy as well that the cases relied on by GMAC and Naiman indicate that in order to have a true lease there must be "facts showing that the lessee is acquiring no equity in the leased article during the term of the lease." *Crest, supra.* Such facts are not present here.

Other cases in which agreements similar to these have been considered have reached the same conclusions as reached by the *Tillery* court. *In Re Brothers Coach Corp.*, 9 U.C.C.R.S. 502 (E.D.N.Y.1971); *G. R. Pierce v. Leasing International, Inc.*, 142 Ga.App. 371, 235 S.E.2d 752 (Ga.App.1977).

THE JUDGMENT OF THE BANK-RUPTCY COURT IS AFFIRMED.