**In re OTASCO, INC., Debtor.**

**WHEELS, INC., Plaintiff/Appellant,**

**v.**

**OTASCO, INC., Defendant/Appellee.**

No. 90–C–300–E.
Bankruptcy No. 88–03410–W.
Adv. No. 89–0204–W.

United States District Court,
N.D. Oklahoma.

Aug. 7, 1991.

E. Mark Barcus, James R. Gotwals & Associates, Frederic Dorwart, Fred Dorwart, Lawyers, Tulsa, OK, for Mohawk Rubber Company.

Leonard I'Pataki, John J. Carwile, Gary M. McDonald, Doerner Saunders Daniel & Anderson, Tulsa, OK, for appellee Otasco, Inc.

Gary H. Baker, Dana L. Rasure, Baker & Hoster, Tulsa, OK, Jonathan Feiger, Kenneth S. Goodsmith, Latham & Watkins, Chicago, IL, Ronald W. Hanson, Latham & Watkins, Chicago, IL, for appellee Ameritrust Co. National Ass'n.

### ORDER

ELLISON, District Judge.

The court now considers the appeal of plaintiff Wheels, Inc. ("Wheels") of the final order of the Bankruptcy Court for the Northern District of Oklahoma dated March 27, 1990, which found in favor of Otasco, Inc. ("Otasco") in a declaratory judgment action to determine the rights of Wheels and Otasco under a motor vehicle lease entered into by the parties.

■ This appeal concerns the findings of fact of the bankruptcy judge concerning the lease. Bankruptcy Rule 8013 sets forth a "clearly erroneous" standard for appellate review of bankruptcy rulings with respect to findings of fact. *In re Morrissey,* 717 F.2d 100, 104 (3rd Cir.1983). However, this "clearly erroneous" standard does not apply to review of mixed questions of law and fact, which are subject to the *de novo* standard of review. *In re Ruti–Sweetwater, Inc.,* 836 F.2d 1263, 1266 (10th Cir.1988); *In re Mullet,* 817 F.2d 677, 679 (10th Cir.1987). This appeal challenges the legal conclusions drawn from the facts presented at trial, so *de novo* review is proper.

### FACTS

On February 2, 1984, Wheels entered into an agreement with Otasco (the "Lease"), which governed the terms under which Otasco, from time to time, would obtain motor vehicles from Wheels. A copy of this Lease is attached as Exhibit "A". The Agreement was designated as a "Lease" and identified Wheels as "Lessor" and Otasco as "Lessee". Paragraph 14 of the Lease was entitled "Ownership" and recited in pertinent part: "It is expressly agreed that the Lessee by virtue of this lease acquires no ownership, title, property, right, interest, (or any option therefor) in any leased motor vehicle save as herein provided...."

The first paragraph of the Lease provided that "Lessee hereby leases one motor vehicle for delivery as specified by Lessee and other motor vehicles as may hereafter be ordered by Lessee ... with the Lessee to have possession and right to use said motor vehicles...." The Lease imposed all burdens and expenses of licensing, registration, taxes, fees, fines and penalties, maintenance and replacement, insurance, and liability for use in connection with the operation of leased vehicles on the Lessee in paragraphs 4, 5, 7, 8, and 11. The Lessee could mark the vehicles with its own insignia, according to paragraph 9. The Lease imposed no duty on the Lessor except delivery of each vehicle at the inception of the Lease and acceptance, disposition, and accounting of and for each vehicle at the termination of the Lease.

The Lease in paragraph 12 provided that "[e]ach motor vehicle shall be leased for an initial term of 12 months from the date of the delivery of such vehicle to Lessee, and thereafter for successive 12 month renewal terms; provided that Lessee shall have the right to cancel any vehicle at any time after the end of the first 12 months of the initial lease term for such vehicle by giving written notice of such cancellation to the Lessor...." No provision in the Lease permitted the Lessor to cancel once a vehicle had been leased, but paragraph 12 stated that "[e]ither Lessee or Lessor may terminate the obligation to lease additional or replacement vehicles at any time upon written notice to the other party". The parties admitted orally that they expected continuation beyond the initial 12–month term, and there was no express limit to the possible number of successive 12–month renewal terms, nor any express option to purchase at any particular time. The rental schedule showed that the parties contemplated renewals of up to fifty (50) months.

The Lease in paragraph 2 provided that "The monthly rental for each motor vehicle shall be computed on the basis of the rider hereto attached marked 'Rental Schedule' and made a part hereof, and is intended to include the Reserve accrued for the estimated depreciation of the leased vehicle." The rentals were computed on the stipulated cost of each vehicle, and 2% of the stipulated cost of each vehicle each month was to be put into the amortization account until 100% of the stipulated cost was paid or for the duration of the contract for each vehicle.

The rental schedule stated that "It is anticipated that at the end of the maximum term herein prescribed, the vehicle will have only scrap value and if for any reason the Lessee desires to continue to operate the vehicle the Lessee agrees to pay to the Lessor a monthly rental of $3.00 during such extended period."

Paragraph 3 of the Lease provided that:
The Lessor, upon receipt of a leased motor vehicle from the Lessee after the termination of the lease of said motor vehicle, will proceed to sell said motor vehicle at wholesale on the best terms available for cash, in the discretion of the Lessor (the

net amount received from the sale of the motor vehicle after deducting any expenses and charges incurred from the time of delivery of the motor vehicle to the Lessor to the final completion of the sale thereof being called the 'Net Proceeds'). If the Net Proceeds plus the amount accrued for the Reserve for said motor vehicle (the 'Total Recovery') is in excess of the 'stipulated cost' of the motor vehicle, then the amount of such excess shall be promptly credited to the Lessee by the Lessor. If the Total Recovery is less than the 'stipulated cost' of the motor vehicle, then the Lessee shall promptly pay such deficiency to the Lessor; provided that in the event of any such sale the Lessor shall guaranty to Lessee that the Net Proceeds shall at least equal (a) the following percentages of the fair value of the vehicle as of the beginning of the 12 month period during which the date of termination occurs:

| Period | Percentage |
|---|---|
| Initial 12 month period of lease | 20% |
| Each subsequent 12 month period | 30% |

less, in any case, (b) the amount of any loss or damage to be insured or borne by Lessee under Section 5 or 11 hereof. As an alternate to sale of the vehicle by the Lessor, the Lessee may, at its option, on 30 days written notice to the Lessor, arrange for the sale of the vehicle for the account of the Lessee (but not to the Lessee), without the services of the Lessor, providing payment is first made to the Lessor by or on behalf of the Lessee of the remaining book balance for said vehicle, and any charges accrued to the Lessor on said vehicle to said date.

Under this provision, lessee could arrange to sell the vehicle at its option, but was expressly *prohibited* from purchasing it.

The parties agreed that the "amount accrued for the Reserve of said motor vehicle" referred to in Paragraph 3 of the Agreement was calculated on the Rental Schedule under the heading "Amortization Account". The "stipulated cost" referred to was not expressly defined in the agreement, but it provided that "[a]t the beginning of each month, the Lessor shall render a monthly invoice to the Lessee for all payments due to the Lessor for all motor vehicles theretofore delivered to

the Lessee, and the Lessee agrees to make prompt payment thereof. The Lessor will also render to the Lessee details of the 'stipulated cost' together with the term of the lease thereof, the rental rate and charges of all motor vehicles delivered to the Lessee."

On November 6, 1988, Otasco filed its petition for relief under 11 U.S.C. Chapter 11. Otasco continued to operate its business and remained in possession of its property as debtor and debtor-in-possession. On July 11, 1989, Wheels filed its complaint seeking declaratory judgment that the Lease was a true lease which Otasco had to assume or reject and the vehicles were therefore owned by Wheels as Lessor and not part of the bankruptcy estate. In the alternative, Wheels claimed it had a perfected security interest in the vehicles. Otasco argued that the Lease was not a true lease, the vehicles were owned by Otasco and thus property of the bankruptcy estate, the Lease was intended as security, and the security interest was not perfected.

As of December 11, 1989, there were twenty-one (21) vehicles in Otasco's possession which it obtained from Wheels. Ten were titled in Oklahoma, three in Georgia, two in Tennessee, two in Louisiana, two in Kansas, one in Arkansas, and one in Texas. All of the vehicle titles listed Wheels as the owner, but not as a lienholder. No lien entry forms pursuant to 47 O.S. § 1110 were ever delivered to the Oklahoma Tax Commission as to any of the vehicles. Fourteen of the vehicles had been sold and the proceeds escrowed, and Otasco was making scheduled payments on the rest.

## CHOICE OF LAW

As a first step in deciding whether Otasco had ownership rights to the vehicles, making Wheels a mere creditor, the court examined the Lease, which said it would be interpreted according to the laws of the State of Illinois. See Exhibit "A", paragraph 15. Wheels is an Illinois corporation, but Otasco is an Oklahoma corporation, most of the vehicles are titled in Oklahoma, and suit was brought in Oklahoma. Wheels asserted that the federal court sitting in Oklahoma must apply the choice of law rules of Oklahoma, that Okla-

homa courts use the Restatement 2nd rules for choice of law, and that, under those rules, the parties' choice of law governs, unless there is no reasonable connection between their choice and the forum state or some fundamental policy of the forum state would be infringed. While noting that this assumption was not well founded, since this was not a diversity case, the Bankruptcy Court determined there was no reason why the parties' choice of law should *not* govern. Thus the applicable substantive law was the Uniform Commercial Code ("UCC") §§ 1–201(37)[1] and 9–102(1)(a)[2], enacted in identical form in Illinois and Oklahoma (until a recent "clarifying" amendment of § 1–201(37) in Oklahoma), concerning "leases" intended as security.

The Bankruptcy Court recognized that the State of Oklahoma amended its version of UCC § 1–201(37) November 1, 1988, and that Bankruptcy Judge Stephen Covey had

found that the amendments were to "clarify" prior law and to that extent were read back into prior transactions. *In re Cole; Woodson v. Ford Motor Credit Co.,* 100 B.R. 561 (Bkrtcy.N.D.Okla.1989). However, Judge Wilson disagreed with this analysis and concluded that the amendments altered case law interpreting and applying the prior text. This analysis was similar to that previously adopted by Judge Wilson in *In re Thompson,* 101 B.R. 658 (Bkrtcy.N.D.Okla.1989), which was also directly contrary to Judge Covey's holding in the factually identical case of *In re Cole.*

Both *In re Cole* and *In re Thompson* were appealed to the District Court, and were consolidated for consideration before Chief Judge H. Dale Cook, in *In re Cole,* 114 B.R. 278 (N.D.Okl.1990). Judge Cook retroactively applied Oklahoma's 1988 version of UCC § 1–201(37)[3], holding that it merely clarified,

1. Title 12A O.S. § 1–201(37) read as follows prior to 1988:

   'Security interest' means an interest in personal property or fixtures which secures payment or performance of an obligation. The retention or reservation of title by a seller of goods notwithstanding shipment or delivery to the buyer (Section 2–401) is limited in effect to a reservation of a 'security interest'. The term also includes any interest of a buyer of accounts, chattel paper, or contract rights which is subject to Article 9. The special property interest of a buyer of goods on identification of such goods to a contract for sale under Section 2–401 is not a 'security interest', but a buyer may also acquire a 'security interest', by complying with Article 9. Unless a lease or consignment is intended as security, reservation of title thereunder is not a 'security interest' but a consignment is in any event subject to the provisions on consignments sales (Section 2–326). Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.

2. Title 12A O.S. § 9–102(1)(a) reads: "Except as otherwise provided in Section 9–104 on excluded transactions, this article applies: to any transaction, regardless of its form, which is intended to create a security interest in personal property or

fixtures including goods, documents, instruments, general intangibles, chattel paper or accounts...."

3. 12A O.S. § 1–201(37), as amended in 1988, reads:

   (37)(a) "Security interest" means an interest in personal property or fixtures which secures payment or performance of an obligation. The retention or reservation of title by a seller of goods regardless of shipment or delivery to the buyer (Section 2–401) is limited in effect to a reservation of a "security interest". The term also includes any interest of a buyer of accounts or chattel paper which is subject to Article 9 of this title. The special property interest of a buyer of goods on identification of such goods to a contract for sale under Section 2–401 of this title is not a "security interest", but a buyer may also acquire a "security interest" by complying with the provisions of Article 9 of this title. Unless a consignment is intended as security, reservation of title thereunder is not a "security interest" but a consignment is in any event subject to the provisions on consignment sales (Section 2–326). (b) Whether a transaction creates a lease or security interest is determined by the facts of each case; however, a transaction creates a security interest if the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee, and:
   (i) the original term of the lease is equal to or greater than the remaining economic life of the goods,

and did not substantively change the earlier version. He proceeded to reject Judge Wilson's imperfected security interest theory in favor of Judge Covey's true lease analysis, in affirming *In re Cole* and reversing *In re Thompson*. This court agrees with and adopts Judge Cook's analysis.

In all fairness, however, it should be noted that when Judge Wilson decided the present case on March 27, 1990, he did not have the benefit of Judge Cook's decision in *In re Cole*, which was decided on April 18, 1990. It is therefore understandable that Judge Wilson would decide this case in a manner that was consistent with his prior ruling in *In re Thompson*.

Judge Wilson examined the case of *In re Loop Hospital Partnership*, 35 B.R. 929 (Bkrtcy.N.D.Ill.1983), and found he was not bound by that decision, because it was distinguishable on its facts. *In re Loop* cited the Tenth Circuit cases of *In re Tulsa Port Warehouse Co., Inc.*, 4 B.R. 801 (N.D.Okla. 1980), *aff'd*, 690 F.2d 809 (10th Cir.1982),

and *U.S. for Eddies Sales and Leasing, Inc. v. Federal Insurance Co.*, 634 F.2d 1050 (10th Cir.1980). In *In re Loop* the court held that a lease of hospital equipment was a true lease because there was no option to purchase, the lease term apparently ended after only five years, there was no evidence to indicate that the property's useful life was exhausted or that the parties intended any continuation of the lease, the lessee was required to return the property to lessor, and there was no evidence to indicate that the property or its value would in any manner be retained by the lessee.

The Bankruptcy Court chose to rely on pre–1988 amendment Oklahoma cases, which were more factually analogous. He cited *In re Tulsa Port, In re Breece*, 58 B.R. 379, 382–383 (Bkrtcy.N.D.Okla.1986), and *In re Harvey*, 80 B.R. 533, 537 (Bkrtcy.N.D.Okla.1987), in support of his conclusions. Those Oklahoma cases had found that secured transactions were shown by: (1) the concentration of all incidents of ownership of the vehicles,

(ii) the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods, (iii) the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement, or (iv) the lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.
(c) A transaction does not create a security interest merely because it provides that:
(i) the present value of the consideration the lessee is obligated to pay the lessor for the right to possession and use of the goods is substantially equal to or is greater than the fair market value of the goods at the time the lease is entered into,
(ii) the lessee assumes risk of loss of the goods, or agrees to pay taxes, insurance, filing, recording, or registration fees, or service or maintenance costs with respect to the goods,
(iii) the lessee has an option to renew the lease or to become the owner of the goods,
(iv) the lessee has an option to renew the lease for a fixed rent that is equal to or greater than the reasonably predictable fair market rent for the use of the goods for the term of the renewal at the time the option is to be performed, or
(v) the lessee has an option to become the owner of the goods for a fixed price that is equal to or greater than the reasonably pre-

dictable fair market value of the goods at the time the option is to be performed.
(d) For purposes of this subsection:
(i) additional consideration is not nominal if:
(A) when the option to renew the lease is granted to the lessee the rent is stated to be the fair market rent for the use of the goods for the term of the renewal determined at the time the option is to be performed, or
(B) when the option to become the owner of the goods is granted to the lessee the price is stated to be the fair market value of the goods determined at the time the option is to be performed. Additional consideration is nominal if it is less than the lessee's reasonably predictable cost of performing under the lease agreement if the option is not exercised;
(ii) "reasonably predictable" and "remaining economic life of the goods" are to be determined with reference to the facts and circumstances at the time the transaction is entered into; and
(iii) "present value" means the amount as of a date certain of one or more sums payable in the future, discounted to the date certain. The discount is determined by the interest rate specified by the parties if the rate is not manifestly unreasonable at the time the transaction is entered into; otherwise, the discount is determined by a commercially reasonable rate that takes into account the facts and circumstances of each case at the time the transaction was entered into.

save bare legal title, in the lessee; (2) the effect of termination provisions, which established an equity in the vehicles in lessee and removed any reversionary interest from lessor; and (3) economic equivalence of the transactions with secured sales or loans.

The Bankruptcy Court held that the termination provisions of the Lease were of an "open-end" type in which the vehicle must be sold, the sale proceeds credited against lessee's monetary obligation, any excess credited to lessee, and any deficiency made up by lessee, placing on the lessee the risk of loss or the expectation of gain upon disposition of each vehicle and establishing an "equity" in the lessee. Indeed, the sale and disposition provisions of this lease *are* open-ended, and this is a concern, because of the Tenth Circuit's holding in *In re Tulsa Port Warehouse Co., Inc.,* 690 F.2d 809 (10th Cir.1982).

In that case, the Tenth Circuit affirmed Judge Thomas R. Brett's ruling that the "open-end" lease agreements were intended for security, even though, as here, those "leases" did not include an option to purchase and the lessor retained title plus the right to receive the wholesale purchase price and an amount which the court there deemed to be "apparent" interest. Judge Brett's opinion is reported at 4 B.R. 801 (N.D.Okla.1980).

The Court of Appeals said, "We agree with the trial judge's conclusion that '[t]he practical effect of this arrangement is the same as if lessee purchased the car, then sold it two or three years later and used the proceeds to pay off the note.' " 690 F.2d at 810.

■ Of course, in the present case, the lease term was a much shorter twelve months. In the event the lease was terminated after its primary term, the transaction would look little like a secured purchase. Nevertheless, this case demands close factual scrutiny, because "whether a particular lease is intended for security is to be determined by the facts of each case." *In re Tulsa Port Warehouse Co., Inc.,* 4 B.R. at 805; 12A O.S.

§ 1–201(37)(b). To assist in such factual analysis, it is helpful to turn to the "clarified" 1988 version of 12A O.S. § 1–201(37).[4]

■ One must look at whether the *original* term of the lease was equal to or greater than the remaining economic life of the goods. Tit. 12A O.S. § 1–201(37)(b)(i) (1988). Here we are dealing with a vehicle lease with a primary term of twelve months, much less than the fifty month economic life the parties expected.

One must look to whether the lessee was bound to renew the lease for the remaining economic life of the goods, and whether the lessee was bound to become the owner of the goods. Section 1–201(37)(b)(ii) (1988). Here, the lessee was not so bound.

Also, one must look to whether the lessee had an option to renew the lease for the remaining economic life of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement. Section 1–201(37)(b)(iii) (1988). Here the lessee had the option to renew, but such renewal required more than nominal additional consideration.

Finally, one must look to whether the lessee had an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement. Here the lessee was expressly prohibited from purchasing it.[5]

The Bankruptcy Court noted that, because the vehicle must be sold and the sale was essentially for the benefit of the lessee, there was no true lease-like reversion in the lessor. This court finds that the provision for the sale of vehicles, with proceeds credited toward the stipulated cost, and the obligation of the Lessee to pay a shortfall, was not designed to create an equity interest in the lessee, but rather to protect the lessor from untoward abuse of its vehicle during the lease term, and any resultant loss in *its* equity, upon reversion of a vehicle. Such a

4. It should be noted that the Tenth Circuit's decision in *In re Tulsa Port Warehouse Co., Inc.,* was handed down in 1982, well before the "clarifying" 1988 amendment to 12A O.S. § 1–201(37).

5. See also, 12A O.S. § 1–201(37)(c)(i-iv) (1988), which in effect provides that a transaction does *not* create a security interest merely because it provides for market value consideration, the Lessee to bear the risk of loss and operational expenses, and/or an option to renew the lease.

provision seems economically prudent in leasing property easily damaged, destroyed, overused, or abused, such as a motor vehicle. The inclusion of such a provision should not, then, cause a lease to be converted into a security agreement absent additional indicia that the parties' true intention was to so structure the transaction.

The Bankruptcy Court also noted that, under the Lease, the lessor gave up any expectation of recovering the vehicles themselves and their value beyond a set amount and ceased to hold even bare legal title to the vehicle upon sale. However, this court differs with the conclusion of the Bankruptcy Court that these termination provisions indicated a lease intended as security rather than a true lease. Rather, these provisions more likely reflect the market realities in the vehicle leasing business. Who is going to initially "lease" a depreciated *used* vehicle?

The Bankruptcy Court found that, despite lack of actual sale prices and dollar amounts in evidence and the apparently calculated obscurity of lease terms such as "reserve" and "stipulated cost", the economic effect of the Lease could be inferred from the contractual provisions themselves. However, the Bankruptcy Court's analysis of the "economic effect" of the lease was inherently flawed in that it presumed renewals of the twelve-month term would be made when there was clearly no obligation to do so.

In *In re Cole* 114 B.R. 278, 285 (N.D.Okl. 1990), Judge Cook recognized that:

A court may not rewrite the parties' contract, nor read terms or provisions into the contract. *See Houston Oilers, Inc. v. Nee-*

*ly,* 361 F.2d 36, 42 (10th Cir.1966); *Sloan v. Mud Products,* 114 F.Supp. 916, 923 n. 20 (N.D.Okla.1953); *King–Stevenson Gas & Oil Co. v. Texam Oil Corp.,* 466 P.2d 950, 954 (Okla.1970).

The Bankruptcy Court's analysis in this case judicially rewrites express contractual terms establishing exclusive ownership in the lessor and a twelve-month primary lease term.

■ The Bankruptcy Court found that it should apply Illinois law and the Illinois enactment of UCC §§ 1–201(37) and 9–102(1)(a). The Bankruptcy Court then concluded it was not bound by the Illinois court's leading decision in *In re Loop Hospital Partnership,* due to factual distinctions. This court agrees that the facts in *In re Loop* are distinguishable and that reference to Oklahoma caselaw involving closely analogous factual patterns is appropriate due to the similarity in the Illinois and Oklahoma statutory enactments of § 1–201(37) of the UCC. However, in light of this court's adoption of Judge Cook's analysis in *In re Cole,* the Bankruptcy Court's reliance on cases decided prior to the 1988 "clarifying" amendment to Oklahoma's enactment of UCC § 1–201(37) was in error.

This court concludes that the Lease was a true lease. This conclusion is compelled once the lease is properly analyzed pursuant to 12A O.S. § 1–201(37), as clarified by the 1988 Amendment. The decision of the Bankruptcy Court is reversed, and the case is remanded for further proceedings consistent with this opinion.

EXHIBIT A

# WHEELS, *Inc.* NATIONAL AUTO LEASING

CHICAGO, ILLINOIS 60659

LEASE

AGREEMENT made this 2 nd day of February 19 84 , by and between WHEELS, INC., a corporation, duly organized under the laws of the State of Illinois, with its principal place of business in Illinois, party of the first part (hereinafter called "Lessor"), and OTASCO, Inc. a corporation, duly organized under the laws of the State of Nevada party of the second part (hereinafter called "Lessee").

1. **POSSESSION.** Lessee hereby leases one motor vehicle for delivery as specified by Lessee and other motor vehicles as may hereafter be ordered by Lessee. The Lessor hereby agrees to deliver to the Lessee the motor vehicles hereinafter described, with the Lessee to have possession of and right to use said motor vehicles in accordance with the terms of this agreement. When any vehicle is delivered to the Lessee, a delivery memorandum shall be delivered to the agent of the Lessee who shall sign the same as a receipt for the motor vehicle. Such delivery memorandum shall describe in detail the motor vehicle and equipment delivered and the parties hereto agree that all the terms and provisions of this lease shall apply and extend to each motor vehicle delivered on such memoranda, in the same manner as if said motor vehicle was herein specifically described.

2. **LESSEE'S PAYMENTS.** Lessee agrees to pay to the Lessor monthly rental payments in advance for each month for each motor vehicle delivered under this lease. The full monthly rental will be billed for the month in which the vehicle is delivered if delivery is accomplished on or before the 15th day of such month (with payment to be made on the first day of the month following delivery). No billing will be made for the month of delivery in the event the vehicle is delivered after the 15th of that month. If the lease of a vehicle is terminated on or before the 15th of the month, no charge will be made for that month; however, if the lease of the vehicle is terminated after the 15th of the month, a full month will be billed for the month of termination. The monthly rental for each motor vehicle shall be computed on the basis of the rider hereto attached marked "Rental Schedule" and made a part hereof, and is intended to include the Reserve accrued for the estimated depreciation of the leased vehicle. At the beginning of each month, the Lessor shall render a monthly invoice to the Lessee for all payments due to the Lessor for all motor vehicles theretofore delivered to the Lessee, and the Lessee agrees to make prompt payment thereof. The Lessor will also render to the Lessee details of the "stipulated cost" together with the term of the lease thereof, the rental rate and charges of all motor vehicles delivered to the Lessee.

3. **LESSEE ACCOUNT.** The Lessor, upon receipt of a leased motor vehicle from the Lessee after the termination of the lease of said motor vehicle, will proceed to sell said motor vehicle at wholesale on the best terms available for cash, in the discretion of the Lessor (the net amount received from the sale of the motor vehicle after deducting any expenses and charges incurred from the time of delivery of the motor vehicle to the Lessor to the final completion of the sale thereof being called the "Net Proceeds"). If the Net Proceeds plus the amount accrued for the Reserve for said motor vehicle (the "Total Recovery") is in excess of the "stipulated cost" of the motor vehicle, then the amount of such excess shall be promptly credited to the Lessee by the Lessor. If the Total Recovery is less than the "stipulated cost" of the motor vehicle, then the Lessee shall promptly pay such deficiency to the Lessor; provided that in the event of any such sale the Lessor shall guaranty to Lessee that the Net Proceeds shall at least equal (a) the following percentages of the fair value of the vehicle as of the beginning of the 12 month period during which the date of termination occurs:

| Period | Percentage |
|---|---|
| Initial 12 month period of lease | 20% |
| Each subsequent 12 month period | 30% |

less, in any case, (b) the amount of any loss or damage to be insured or borne by Lessee under Section 5 or 11 hereof. As an alternate to sale of the vehicle by the Lessor, the Lessee may, at its option, on 30 days written notice to the Lessor, arrange for the sale of the vehicle for the account of the Lessee (but not to the Lessee), without the services of the Lessor, providing payment is first made to the Lessor by or on behalf of the Lessee of the remaining book balance for said vehicle, and any charges accrued to the Lessor on said vehicle to said date.

4. **LICENSE AND USE.** During the term of this lease, Lessee shall have possession of and right to use the said motor vehicles for lawful purposes only and for exclusive use within the United States and Puerto Rico. All motor vehicles shall be registered in the name of the Lessor during the entire term of the lease, and any certificates of title required shall likewise be in the name of the Lessor. The Lessee shall pay all costs, fees and expenses required in licensing and registering said motor vehicles in the state or states where they are used, obtaining certificates of title therefor, and use, sales, personal property and other taxes, license fees, fines and penalties, levied by Federal, State or Local government covering the possession, use, or misuse of the leased motor vehicle, it being the intent of the within lease that all taxes, and charges (other than Federal income taxes) imposed upon the ownership or operation of the leased motor vehicle shall be paid by the Lessee. The limitation as to use of the vehicle within the United States and Puerto Rico, shall not restrict casual or occasional crossing into Canada where the vehicle is used principally and primarily by the Lessee within the United States and Puerto Rico.

5. **MAINTENANCE AND REPLACEMENT.** Lessee shall, at all times, at its own expense, cause the leased motor vehicles to be maintained in good working condition and appearance, and Lessor shall have no responsibility therefor, or for any damages sustained by the Lessee, or others in privity with him, by virtue of any mechanical or operational failure of the leased motor vehicle during the term of the lease. Lessee agrees that all maintenance and replacement expense, including repairs, gasoline, oil, grease, tires, tubes, storage, parking, tolls, adjustments and other services shall be solely at the expense of the Lessee, it being the intent herein that the Lessor shall not be responsible for any charges or claims in connection with the operation of the leased vehicle.

6. **SERVICE OF LESSOR.** In addition to making delivery of the motor vehicles, as herein above described, the Lessor agrees that upon delivery by the Lessee to the Lessor of a leased motor vehicle at the termination of the lease of said motor vehicle, the Lessor will render efficient service in sale or disposal of the leased motor vehicle to obtain the largest net return for the Lessee.

7. **LIABILITY OF LESSOR.** The Lessor shall not be liable for any loss of business or profit, or other damages caused by any interruption of the service herein specified to be given by the Lessor. Lessor shall be responsible for obtaining and delivering to the agents of the Lessee the motor vehicles to be covered by this lease, but Lessor shall not be liable to the Lessee if failure to deliver motor vehicles under this agreement be due to strike or other causes beyond the control of the Lessor in the exercise of reasonable care. It is expressly understood and agreed that Lessor assumes no liability for any acts or omissions of Lessee, or of Lessee's agents, servants or employees, or for any property of Lessee and any persons in privity with Lessee, damaged, lost or stolen in or from the motor vehicles.

8. **LEGAL COVENANTS.** Lessee shall maintain and operate said motor vehicles in strict conformity with all laws and ordinances, State, Federal or Local and shall not permit said motor vehicles to be used for the unlawful transportation of alcoholic beverages or narcotics. Lessee may use said motor vehicles at any and all times for any and all legal purposes, but the Lessee agrees not to permit the leased vehicles to be driven except by agents, employees of the Lessee or persons authorized to drive such vehicles by the Lessee and it is the sole responsibility of the Lessee to provide drivers for the leased vehicles, this responsibility to include Lessee's exclusive control of said drivers, assumption of full responsibility for drivers' wages, employment and workmen's compensation insurance, social security and other requirements, and any traffic violations in which said leased vehicles may be involved. If Lessee uses or allows any vehicles to be used for illegal purposes or for purposes not permitted under this lease, Lessee agrees to pay any fines or penalties thereby incurred, and to reimburse Lessor for all damages sustained by Lessor as a result of such misuse. In addition to and notwithstanding its right to such reimbursement, Lessor may in such event at its option cancel this contract. The possession of the leased vehicle by someone other than the Lessee and its agents, during the time in which the leased motor vehicle is leased to the Lessee, shall be the responsibility of the Lessee and shall require its continued strict compliance with all the terms of this agreement as relates to said motor vehicle.

9. **INSIGNIA.** Lessee shall have the right, at its own expense, to affix to every motor vehicle so leased or loaned to it, any appropriate advertisement or insignia of its own design indicating that it is being used in the service of the Lessee.

10. **DEFAULT.** If Lessee shall fail to make any of the payments herein specified, or shall fail to perform, or permit to be broken, any of the covenants and agreements herein contained, Lessor shall have the right to declare this lease void so far as the rights of the Lessee are concerned and to take immediate possession of said motor vehicles wherever found with or without process of law and to hold Lessee responsible for any damage which the Lessor sustains by virtue of said occurrence.

11. **INSURANCE.** Lessee agrees to assume all liability for injury, death, or property damage occasioned by the operation and possession of the motor vehicle during the term of the lease and agrees to indemnify and save harmless, Lessor, against any claim or liability, loss, or expense, including legal expense, in respect to bodily injury, or death, or damage to property arising out of the possession of the motor vehicle during the term of this lease or any renewal thereof. In addition, Lessee hereby agrees to effect, pay for and maintain indemnity insurance issued by a responsible company, protecting the interests of the parties to this contract against liability for damages for personal injury or death, caused by any motor vehicle leased herein or its operation to the extent of One Million Dollars ($1,000,000.00) combined single limit for each occurrence covering bodily injuries, and also to effect, pay for and maintain insurance issued by a responsible company in the sum of One Hundred Thousand Dollars ($100,000.00) per accident against liability for damage to property caused by the operation of any motor vehicle leased herein. Lessee further agrees to be liable to the Lessor for damage, loss or destruction of each motor vehicle during the term of the lease, and agrees that each motor vehicle shall be covered by collision insurance for full fair value and for comprehensive damage, including fire, theft and conversion. The Lessee agrees to furnish the Lessor with insurance certificates or other acceptable written evidence of the within described insurance coverage which will include Lessor's name as an additional assured. Should any action or claim be made against the Lessor for damages arising from any of the causes covered in the within paragraph, Lessor agrees promptly to notify Lessee thereof, and to permit Lessee to conduct the defense of any such claim or action at Lessee's expense. In the event of the cancellation of any of the insurance required under the terms of this agreement, immediate notice thereof shall be given to the Lessor. If the Lessee cannot or does not desire to take out insurance in its own name to cover the risks herein described, the Lessor agrees to attempt to provide such coverage in the name of Lessor with the Lessee named as an additional assured, and the Lessee agrees to make prompt payment to the Lessor for the coverage obtained by the Lessor. If the Lessor is unable to obtain the coverage as herein described, or for other reasons acceptable to the Lessor, the Lessee shall desire to "self-insure," then when requested by the Lessee, and permissible by laws relating to the leased vehicles, the Lessor will offer to the Lessee the alternative of either the Lessor self-insuring with the Lessee to pay the reasonable cost therefor, or permitting the Lessee to self-insure under proper provisions acceptable to the Lessor, but nothing herein contained shall relieve the Lessee for the full and primary liability for the operation and possession of the motor vehicle as hereinabove stated.

12. **TERM OF THE LEASE.** Either Lessee or Lessor may terminate the obligation to lease additional or replacement vehicles at any time upon written notice to the other party. Such termination shall be limited to precluding delivery of additional or replacement vehicles not previously ordered, but this lease shall continue in full force and effect on all vehicles under lease hereunder on the date of such termination and until the expiration of the lease terms for such vehicles. Each motor vehicle shall be leased for an initial term of 12 months from the date of the delivery of such vehicle to Lessee, and thereafter for successive 12 month renewal terms; provided that Lessee shall have the right to cancel any vehicle at any time after the end of the first 12 months of the initial lease term for such vehicle by giving written notice of such cancellation to the Lessor, in which event the effective date of such cancellation shall be the delivery date of a replacement vehicle, or, in case of a cancellation where no replacement vehicle is involved, the first to occur of (a) the date of sale, or (b) the 30th day after the notice of cancellation shall have been received by Lessor and the vehicle shall have been returned to Lessor. Lessee agrees that upon termination of the lease of a motor vehicle for any reason whatsoever, the Lessee will cause the motor vehicle to be returned to the Lessor within the Continental United States, or if such vehicle is originally delivered in Hawaii, Alaska or Puerto Rico, Lessee will cause such vehicle to be returned to the point of original delivery.

13. **ASSIGNMENT.** Lessee agrees not to assign, transfer, sublet or otherwise transfer its rights hereunder, whether by operation of law or otherwise, without the prior written consent of Lessor, and will not pledge, mortgage or otherwise encumber or permit said vehicle to be subjected to any lien, charge, right or interest of the Lessee hereunder. Lessor may at any time assign all or any part of Lessor's right, title and interest in, to and under this lease and in, to and under the rents and other sums at any time due or to become due or at any time owing or payable by Lessee under any provision of this lease. No such assignee shall be obligated to perform any duty, covenant or condition required to be observed or performed by Lessor and any such assignment shall not relieve the Lessor from any of its obligations hereunder. Without limiting the generality of the foregoing, Lessee agrees that, in the event of any such assignment, the rights of any assignee under this lease and in and to the sums payable by Lessee under this lease shall not be subject to any abatement whatsoever and Lessee shall be unconditionally obligated and continue to pay such sums to such assignee, and same shall not be subject to any defense, setoff, counterclaim or recoupment whatsoever, arising between Lessor and Lessee hereunder for any other reason whatsoever.

14. **OWNERSHIP.** It is expressly agreed that the Lessee by virtue of this lease acquires no ownership, title, property, right, interest, (or any option therefor) in any leased motor vehicle save as herein provided, and that the Lessor at its option may title a leased motor vehicle in the name of a trustee instead of in the name of the Lessor, with the same force and effect as though the leased motor vehicle were titled in the name of the Lessor.

15. **GENERAL.** This lease together with the Rental Schedule below embodies the entire agreement between Lessor and Lessee and there are no collateral agreements, either oral or written. The provisions of this lease shall be interpreted according to the laws of the State of Illinois. No change or modification of the terms of this lease shall be binding on the Lessor, unless such change or modification be in writing and signed by an executive officer of Lessor. The term "Lessee" includes any subsidiary of Lessee, and any division of Lessee or any such subsidiary, to whom motor vehicles are delivered hereunder. This Lease supersedes all prior agreements between the parties with respect to all motor vehicles now or hereafter leased by Lessor to Lessee. The section headings herein are for convenience only and shall not affect the interpretation of any of the provisions hereof.

16. **COMMERCIAL LEASE.** This lease is for agricultural, business or commercial purposes, and is not primarily for personal, family or household purposes.

This lease is executed in triplicate and a copy thereof delivered to Lessee, receipt of which copy is hereby acknowledged by Lessee.

IN WITNESS WHEREOF, Lessor and Lessee have caused these presents to be executed the day and year first above written.

LESSEE                                    LESSOR

OTASCO, Inc.                              WHEELS, INC., a corporation

By: X _Richard L. Messer_                By: X _____ _exec._, President
    Vice President of Human Resources

# Rental Schedule

*(Rider attached to and made a
part of this lease.)*

The monthly payment for each vehicle shall be computed as follows:

### RENTAL:

The rental shall be computed on the stipulated cost of the vehicle at the rates shown below for the period of rental indicated:

| | |
|---|---|
| 1st - 12th Month | 2.9928% |
| 13th - 24th Month | 2.7428% |
| 25th - 36th Month | 2.4629% |
| 37th - 48th Month | 2.2329% |
| 49th - 50th Month | 2.0987% |

Provided, however, that at no time will the rental be less than a minimum of $3.00 per month.

### AMORTIZATION ACCOUNT:

2.00% per month of the stipulated cost of each vehicle for the duration of the contract for such vehicle or until a total of 100% of the stipulated cost shall have been paid, whichever occurs first.

It is anticipated that at the end of the maximum term herein prescribed, the vehicle will have only scrap value and if for any reason the Lessee desires to continue to operate the vehicle the Lessee agrees to pay to the Lessor a monthly rental of $3.00 during such extended period.

The rental hereinabove specified may be changed on notice from the Lessor to the Lessee but only as it affects vehicles delivered after the effective date of change cited in said notice.

### ADDENDUM TO PARAGRAPH 5

"Lessor hereby assigns and transfers to Lessee all right, title and interest in and to any and all manufacturers' warranties, guarantees, maintenance protection plans and extended service plans of whatsoever nature or kind for the duration of each Lease Agreement pertaining to vehicles obtained by Lessee by or through Lessor."

"Lessor further agrees to assist Lessee in the processing of policy adjustment claims with the manufacturers and distributors of vehicles leased by Lessee by or through Lessor, and shall assign to Lessee any and all recoveries and other benefits received, directly or indirectly, by Lessor from said manufacturers or distributors."