**In re FURLEY'S TRANSPORT, INC., Debtor.**

**ZVI Guttman, Chapter 7 Trustee, Plaintiff,**

v.

**Associates Commercial Corporation, Defendant.**

Bankruptcy No. 98–6–6900–SD.
Adversary No. 00–5602–SD.

United States Bankruptcy Court,
D. Maryland,
at Baltimore.

Sept. 6, 2001.

Leonard   Kohlenstein,   Baltimore,   MD, for Debtor.

Zvi Guttman, The Law Offices of Zvi Guttman, P.A., Baltimore, MD, Chapter 7 Trustee.

## *MEMORANDUM OPINION AVOIDING TRANSFERS*

E. STEPHEN DERBY, Bankruptcy Judge.

This matter comes before the court on the Trustee's Complaint to recover preferential, unauthorized, and avoidable transfers under 11 U.S.C. §§ 544, 547, 549, and 550. The specific issues raised in this adversary proceeding are whether the Trustee possesses rights to eight trailers that are superior to the lien rights asserted by the Defendant, Associates Commercial Corporation ("ACC"), and whether the Trustee can avoid certain monetary transfers to ACC.

### I. *Introduction*

On December 2, 1998 (the "Petition Date") the Debtor, Furley's Transport, Inc. ("Furley's"), filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The case was converted to a case under Chapter 7 on March 15, 1999, and Zvi Guttman, the Plaintiff herein, was appointed to be the Trustee. The Trustee seeks to avoid liens against eight trailers owned by the Debtor and financed by ACC. The complaint seeks relief pursuant to 11 U.S.C. §§ 544 (Count I, Trustee as lien creditor), 547 (Count II, preferential transfer) and 549 (Count III, postpetition transfer). The Trustee also seeks to avoid

$14,878.10 in monetary transfers (the "Monetary Transfers") by the Debtor to ACC pursuant to 11 U.S.C. § 547 (Count IV) and to recover up to $180,478.10 from ACC, which allegedly represents the aggregate purchase price of the trailers plus the Monetary Transfers, pursuant to 11 U.S.C. § 550.

### II. *Facts*

In the three years preceding the Petition Date, the Debtor purchased four tractors and eight trailers from several different companies. ACC financed all of these transactions. In exchange, the Debtor executed six security agreements. Four of the trailers, collectively identified as the "Oklahoma Trailers,"[1] are covered by a security agreement dated November 12, 1997. *See* Trustee's Ex. 1. The remaining four trailers, collectively identified as the "Pennsylvania Trailers",[2] are covered by a security agreement dated January 27, 1998. *Id.* The four tractors, collectively identified as the Tractors,[3] are covered by four separate security agreements executed between September 13, 1996 and December 2, 1997. *Id.* Contemporaneous with the execution of the security agreements, each seller assigned to ACC all of its right, title and interest in and to the vehicles involved in the transaction, the security agreement, all notes, guaranties and other documents executed in connection with the security agreement, and all amounts due from the Debtor for the vehicles. *Id.*

---

1. The Oklahoma Trailers are identified by the following vehicle identification numbers: (1) 1GRAA9626PB014021; (2) 1GRAA9620PB014001; (3) 1GRAA9625PB014026; and (4) 1GRAA9627PB014030.

2. The Pennsylvania Trailers are identified by the following vehicle identification numbers: (1) 1GRAA9622PB014002; (2) 1GRAA9628PB014005; (3) 1GRAA9629PB014028; and (4) 1GRAA9621PB014010.

3. The Tractors are identified by the following vehicle identification numbers: (1) 1FUPCSZB5WL888265; (2) 1FUPCSZB7WL888252; (3) 1XKADB9X1TJ730460; (4) 2FUPDSZB1VA802953.

On February 3, 1999 ACC filed a Motion for Relief From the Automatic Stay with respect to the Tractors and the Pennsylvania and Oklahoma Trailers. *Id.* This motion recited that ACC believed it held perfected security interests in the Tractors, but unperfected security interests in the Pennsylvania and Oklahoma Trailers. *Id.* It also alleged the Debtor owed ACC $554,690.64 plus attorney fees, interest and other expenses. *Id.* On March 8, 1999, after service of the motion on the 20 largest unsecured creditors pursuant to Fed. R.Bankr.R. 4001(a) and without opposition, the court entered a Consent Order Granting [ACC] Relief From the Automatic Stay. (Dkt. 98) ("Consent Order"). The Consent Order lifted the automatic stay as to the Tractors and the Oklahoma and Pennsylvania Trailers, and it authorized ACC "immediately to exercise all of its rights under the Security Agreements and applicable non-bankruptcy law, including the right to take possession and dispose of the foregoing collateral." *Id.*

After the Consent Order was entered, ACC repossessed all twelve vehicles. It filed applications to secure repossession titles for the Pennsylvania Trailers with the Motor Vehicle Bureau of the State of Missouri Department of Revenue ("Missouri MVB"). *See* Df.'s Exs. 25–28. After this case was converted to Chapter 7, the Missouri MVB sent statutory notice of the applications to the Debtor, which the Trustee received. The notices imposed a September 7, 1999 deadline for filing objections to ACC's application. After the deadline passed without objection from the Trustee, the Missouri MVB issued repossession titles to ACC. At some point, ACC sold the Oklahoma and Pennsylvania Trailers; however, ACC claims it has either lost or misplaced information about the sale, including the sale price and the buyer's name.

### III. *Summary Judgment Stage*

The Trustee filed a Motion for Summary Judgment in this proceeding, which was granted in part and denied in part in two separate memorandum opinions and orders. In its first opinion, the court ruled that Oklahoma law would determine if and when ACC's interests in the Oklahoma Trailers were perfected. (Dkt. 24). In the second opinion, the court ordered and declared that ACC did not have a perfected security interest in the Pennsylvania Trailers as of the Petition Date. (Dkt. 47 at 13). The court also found that Pennsylvania law controlled the effect of perfection or non-perfection of ACC's interests in the Pennsylvania Trailers. *Id.* at 7–8.

### IV. *Effect of Revisions to Article 9 of the Uniform Commercial Code*

After the trial but before this opinion was drafted, revisions to Article 9 of the Uniform Commercial Code ("UCC") went into effect in many states across the country, including Pennsylvania and Oklahoma. However, pursuant to a "savings clause" enacted by both Pennsylvania and Oklahoma, the revised UCC does not apply to actions commenced prior to its July 1, 2001 effective date. *See* 12A Okla.St.Ann. § 1–9–702 (2001); 2001 Pa.Laws SB 330 (Uniform Commercial Code Modernization Act of 2001). As this proceeding commenced before July 1, 2001, aspects of this opinion that relate to the UCC are based on the versions of the UCC enacted in Pennsylvania and Oklahoma before the 2001 revisions.

### V. *Discussion*

#### A. *Count I—11 U.S.C. § 544*

■ Section 544(a) of the Bankruptcy Code provides that, as of the date of the bankruptcy petition filing, the trustee obtains the rights of a hypothetical judgment

lien creditor.[4] Through this statute, the trustee "becomes the 'ideal creditor, irreproachable and without notice, armed *cap-a-pie* with every right and power which is conferred by the law of the state upon its most favored creditor who has acquired a lien by legal or equitable proceedings.' " *Havee v. Belk*, 775 F.2d 1209, 1218 n. 15 (4th Cir.1985), *quoting In re Kravitz*, 278 F.2d 820, 822 (3rd Cir.1960). The Trustee argues that pursuant to Section 544, his rights trump those of ACC with respect to the Pennsylvania and Oklahoma Trailers.

### 1. *Pennsylvania Trailers*

■ The court has previously determined that ACC did not have a perfected security interest in the Pennsylvania Trailers as of the Petition Date, i.e. as of the commencement of the case. *See* Dkt. 47 at 13. Under Pennsylvania law, ACC's security interest is subordinate to the claim of a creditor who obtained a judicial lien on the Petition Date. *See* 13 Pa.C.S. § 9301(a)(2).[5] Therefore, because ACC's prepetition contractual security interest was unperfected as of the commencement of this case, it is subordinate to the Trustee's rights under 11 U.S.C. § 544(a)(1); and the Trustee may avoid Debtor's transfer that created ACC's security interest.

ACC has raised two waiver arguments in its defense. First, ACC argues that the Debtor, as debtor-in-possession, waived its rights under Section 544 in the Consent Order. Since the Trustee is generally bound by agreements between the debtor-in-possession and its creditors, and since the debtor-in-possession allegedly waived its right to bring a preference action, ACC contends the Trustee's hands are tied by the debtor-in-possession's agreement. Second, ACC argues in the alternative that the Trustee himself waived his rights as a judgment lien creditor when he failed to object to the post-petition retitling and resale of the Pennsylvania Trailers.

■ Under Maryland law, a "waiver is the intentional relinquishment of a known right, or such conduct as warrants an inference of the relinquishment of such right, and may result from an express agreement or be inferred from the circumstances." *BarGale Indus., Inc. v. Robert Realty Co.*, 275 Md. 638, 643, 343 A.2d 529 (1975); *Holder v. Maaco Enterprises*, 644 F.2d 310, 312 (4th Cir.1981) ("Maryland law ... instructs us that waiver of legal rights is a serious matter.").

ACC's waiver arguments fail. The debtor-in-possession did not waive the Trustee's rights as a judicial lienor by signing the Consent Order. The order only authorized ACC to exercise whatever rights it had in the collateral. It did not state that avoidance claims could not be pursued, nor did it waive any right to pursue such claims.

**4.** 11 U.S.C. § 544(a) provides in relevant part:

> (a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—
> (1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained a judicial lien, whether or not such a creditor exists.

**5.** 13 Pa.C.S.A. § 3901 provides, in relevant part:

> (a) General rule.—Except as otherwise provided in subsection (b), an unperfected security interest is subordinate to the rights of:
> (2) a person who becomes a lien creditor before the security interest is perfected.

As to ACC's alternative waiver argument, the Trustee's mere receipt of and failure to respond to the statutory notice of ACC's applications to retitle the Pennsylvania Trailers in Missouri does not constitute a valid waiver of his right to pursue an avoidance action under Section 544. ACC did not request, and the Trustee did not volunteer, an express waiver of any cause of action under the Bankruptcy Code. Consequently, any waiver must be inferred from the circumstances. No such inference results from the facts presented in this case. ACC does not contend that the Trustee took any affirmative act to indicate he was voluntarily giving up his right to pursue avoidance actions. ACC only alleges that the Trustee received Repossession Notification letters from the Missouri Department of Motor Vehicles and failed to object. The letters informed the Trustee that once Missouri issued the repossessed titles, all ownership rights in the vehicles would pass to the designated title holder, namely, ACC.[6] An action predicated on Section 544 is an avoidance power, not an "ownership right." 11 U.S.C. § 544(a). Further, whatever state law rights the Trustee may have waived when it failed to object to ACC's actions, Missouri lacked the power to deprive the Trustee of his rights as a judicial lienor provided under federal law. *See* U.S. Const. art. VI, cl. 2. Therefore, the court does not find that the Trustee waived his rights as a judicial lienor under Section 544.

### 2. *Oklahoma Trailers*

■ A central issue at trial was whether ACC had perfected its security interests in the Oklahoma Trailers prior to the December 2, 1998 petition date. The Trustee argues that ACC's interest was unperfected because ACC failed to deliver a lien entry form to the Oklahoma Tax Commission ("OTC") or to a motor license agent until 1999. ACC counters that it was not required to deliver a lien entry form because the secured party was noted on the face of the title documents presented to the OTC. To address this issue, the court turns to state law, which governs the determination of property interests in bankruptcy cases. *Butner v. United States,* 440 U.S. 48, 54–55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); *Universal Coops., Inc. v. FCX, Inc. (In re FCX, Inc.),* 853 F.2d 1149, 1153 (4th Cir.1988), *cert. denied,* 489 U.S. 1011, 109 S.Ct. 1118, 103 L.Ed.2d 181 (1989). This Court has previously ruled that Oklahoma law governs the perfection of the Oklahoma Trailers. *See* P. 24.

### a. *Perfection of Security Interests in Vehicles Under Oklahoma Law*

■ Under Oklahoma law, perfection of a security interest in a vehicle occurs upon the delivery of the following four items to the Oklahoma Tax Commission or a motor license agent:

(1) a lien entry form;

(2) the existing certificate of title or an application for a certificate of title;

(3) the manufacturer's certificate of origin, containing the name and address of the secured party and the date of the security agreement; and

(4) the required fee.

47 Okla.St.Ann. § 1110(A)(1); *Chief Freight Lines Co. v. Strick Fin. Co. (In re*

---

**6.** The Repossession Notification letters mailed by the Missouri Motor Vehicle Bureau state the consequences of a failure to object to the issuance of repossession titles: "After a repossessed title is issued, ownership rights to the vehicle shall pass exclusively to the designated title holder. Any outstanding original or duplicate title certificate for this vehicle will become void." Df.'s Exs. 25–28.

*Chief Freight Lines Co.),* 37 B.R. 436, 439 (Bankr.N.D.Okla.1984). This method of perfection is exclusive. Failure to deliver any of the required items amounts to "total noncompliance with the statute" and defeats a creditor's claim that its security interest is perfected. *Wheels Inc. v. Otasco Inc. (In re Otasco, Inc.),* 111 B.R. 976, 990 (Bankr.N.D.Okla.1990), *rev'd on other grounds,* 196 B.R. 554 (N.D.Okla.1991); *see also Liberty Nat'l Bank & Trust Co. of Okla. City v. Garcia,* 686 P.2d 303, 306 (Okla.App.1984); *Paul Arpin Van Lines, Inc. v. Babb (In re Hughen),* 38 B.R. 13, 15 (Bankr.W.D.Okla.1983) (interpreting the predecessor to 47 Okla.St.Ann. § 1110(A)). The perfection of security interests in vehicles under Section 1110(A)(1) begins from the date the lien entry form is executed

> [i]f the lien entry form, the lien filing fee and the certificate of title or application for certificate of title and the manufacturer's certificate of origin are delivered to the Commission or to a motor license agent within twenty (20) days after the date of the lien entry form … otherwise, perfection … begin[s] from the date of the delivery [of these four items] to the Commission or to a motor license agent.

47 Okl.St.Ann. § 1110(A)(2).

### b. *Evidence—Expert Testimony and Exhibits*

■ The evidence presented by the Trustee persuades the court that ACC had not perfected its security interest in the Oklahoma Trailers as of the Petition Date because ACC did not deliver lien entry forms until 1999. During his case-in-chief, the Trustee called Mr. Jim Ballard and qualified him as an expert regarding "Oklahoma title documents." Mr. Ballard has been a title consultant for the Oklahoma Tax Commission for approximately twelve years. In this position, he arranges for titling and registration of vehicles and

solves problems local motor tag agents are unable to resolve. Mr. Ballard examined each of the certified copies of title histories the Trustee had obtained from the OTC for the four Oklahoma Trailers. Each title history contained a Vehicle Title Receipt, an Oklahoma Certificate of Title, a Lien Inquiry Form, and a Lien Entry Form. *See* Trustee's Ex. 22. Since the Oklahoma Trailers were originally titled in Pennsylvania, the title histories also contained copies of Pennsylvania certificates of title for each vehicle.

The title histories themselves are somewhat confusing. Each lien entry form states that the OTC received the forms on November 19, 1997. *See* Trustee's Ex. 3. The vehicle title receipts state: "This Vehicle Is Subject to the Following Liens: 11/19/1997 12:00 Associates Commercial Corp." *Id.* The certificates of title also reflect an issue date of November 19, 1997. *Id.* However, on the original Oklahoma certificates of title, only blank space appears below the words "This vehicle is subject to the following lien(s):". *Id.* In addition, the applications for Oklahoma certificates of title state that the vehicles are not subject to any liens. *Id.* The Pennsylvania certificates of title turned in to the OTC show that someone had gone so far as to type ACC's name and address in the portion of the certificates labeled "Application for Title and Lien Information," but there is no evidence ACC ever perfected its interest in these trailers while they were titled in Pennsylvania. *Id.* Further, the "Lien Receipt Number" on the lien inquiry forms shows that ACC's liens were not added to the vehicle title receipts and lien entry forms until March 4, 1999. *Id.*

Mr. Ballard was able to explain and interpret the title histories. He testified ACC's liens were not noted on the original certificates of title when the OTC received

the lien entry forms. He further testified that the "Receipt Numbers" on the lien entry forms reflect that the forms were not submitted to the OTC until March 3, 1999. The liens were then backdated to November 19, 1997, the date the original Pennsylvania title documents were surrendered to the OTC. According to Mr. Ballard, the OTC has discretionary authority to backdate liens to rectify administrative problems. The procedure is intended to protect lienholder's interests by accurately reflecting the date the lien should have been noted on the title documents.

#### c. *Perfection*

ACC did not rebut or present any additional evidence to contradict Mr. Ballard's interpretation of the information contained in the title histories. Instead, ACC raises an alternative argument: even if it did not satisfy the express requirements of 47 Okl. St.Ann. § 1110(A), it was nevertheless perfected pursuant to 47 Okl.St.Ann. § 1105(G).[7] Section 1105(G) provides an alternative route to perfecting security interests for certain vehicles titled outside of Oklahoma that are subsequently registered in Oklahoma. However, the statute only applies if either the face of the out of state certificate of title contains the secured party's name or the secured party is holding the out of state certificate of title. *Id.*

Section 1105(G) does not apply in this case. At trial, ACC only argued that the statute applied because ACC's name appeared on the face of the Pennsylvania certificates of title. It did not contend that it held the Pennsylvania certificates when the Oklahoma Trailers were registered in Oklahoma. Although ACC's name and address appears on the first page of the Pennsylvania certificates of title, its name does not appear "on the face of" the Pennsylvania certificates. This conclusion is compelled both by a physical examination of the Pennsylvania certificates of title and by reference to the Pennsylvania statute which describes the documentation necessary to note a lien on a certificate of title.

Pennsylvania's certificates of title are divided into two distinct sections. *See* Trustee's Ex. 22 at 11. The upper portion contains spaces for information about the vehicle, the registered owner, and for first and second lien holders. The Secretary of Transportation's signature appears at the bottom of the upper portion of the certificate. The lower portion of the certificate appears below the Secretary of Transportation's signature and has a separate caption: "D. Application for Title and Lien Information." *See* Ex. 22 at 11. In the Pennsylvania title certificates obtained by the Trustee from the OTC, the upper portions do not note any first or second lien holders. Although the lower portions of the certificates each contain ACC's name and address, they are otherwise incom-

---

7. 47 Okl.St. § 1105(G) states, in relevant part: When registering in this state a vehicle which was titled in another state and which title contains the name of a secured party *on the face of* the other state certificate of title, or such state certificate is being held by the secured party in that state or any other state, the [Oklahoma Tax] Commission or the motor license agent shall complete a lien entry form as prescribed by the Commission. The owner of such vehicle . shall file an affidavit with the Commission or the motor license agent stating that title to the vehicle is being held by a secured party has not been issued pursuant to the laws of the state where titled, and that there is an existing lien or encumbrance on the vehicle. The current name and address of the secured party or lienholder shall also be stated in the affidavit. . . . [A]nd the lien or encumbrance shall be deemed continuously perfected as though it had been perfected pursuant to Section 1110 of this title. . . . (Emphasis supplied.)

plete, i.e., no "lien date" has been supplied, nor has the application been signed, nor does it contain a notary's seal. It therefore appears that the Application for Title and Lien Information portion included beneath the certificate of title is not part of the "face" of the certificate.

The procedure for noting a lien on a Pennsylvania certificate of title supports this conclusion. Under Pennsylvania law, security interests in vehicles are perfected by notation of the interest on the vehicle's certificate of title. 75 Pa.C.S.A. § 1132(b).[8] To obtain such a notation, the statute requires the lienholder to deliver any existing certificate of title *and* an application for a certificate of title containing the lienholder's name and address. *Id.* If the application for a certificate of title were part of the face of the certificate of title, then it would be redundant to require lienholders to supply both documents. In addition, the statute explicitly requires applications for certificates of title to be completed on a "form prescribed by the department." *Id.* If this form was on the face of the certificate of title, then there would be no need to direct applicants to complete a separate form.

### d. *11 U.S.C. § 544*

The Trustee has established that ACC failed to perfect its security interest in the Oklahoma Trailers pursuant to 47 Okl.St. Ann. § 1110(A) as of the Petition Date because no lien entry forms were delivered to the OTC until March 3, 1999. In addition, the alternative method of perfection supported by ACC under 47 Okl.St.Ann. § 1105(G) is inapplicable. Under Oklahoma law, ACC's security interest is subordinate to the claim of a creditor who obtained a judicial lien on the Petition Date. *See* 12A Okl.St.Ann. § 9–301.[9] Therefore, the Trustee has the right to avoid the transfer pursuant to 11 U.S.C. § 544(a)(1).

### B. *Counts II and IV—11 U.S.C. § 547*

Section 547(b) of the Bankruptcy Code gives the Trustee the power to avoid transfers "made within a limited time prior to the filing of a bankruptcy petition that enables a creditor to receive more than the creditor would otherwise receive if, instead, the creditor were limited to his or her share of a distribution resulting from a Chapter 7 liquidation." *Smith v. Creative Financial Management, Inc. (In re Virginia–Carolina Financial Corp.)*, 954 F.2d 193, 196 (4th Cir.1992) (citing 11 U.S.C. §§ 544–551, 553 (1988)). Specifically, Section 547(b) permits the Trustee to avoid any transfer of an interest of the debtor in property

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

---

8. 75 Pa.C.S.A. § 1132(b) provides:

    Method of perfection.—A security interest is perfected at the time an application for a certificate of title is received or date stamped by the department. In order to obtain such notation the lienholder shall deliver to the department the existing certificate of title, if any; an application for a certificate of title upon a form prescribed by the department containing the name and address of the lienholder; and any other information regarding the security interest

as may be reasonably required and the required fee.

9. 12A Okl.St.Ann. § 9–301 (2000) provides, in relevant part:

    Persons Who Take Priority Over Unperfected Security Interests; Right of "Lien Creditor." (1) Except as otherwise provided in subsection (2) of this section, an unperfected security interest is subordinate to the rights of: (b) a person who becomes a lien creditor before the security interest is perfected;

(4) made—

    (A) on or within 90 days before the date of the filing of the petition; or

    (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

    (A) the case were a case under Chapter 7 of this title;

    (B) the transfer had not been made; and

    (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b). For purposes of Section 547, the court presumes the Debtor was insolvent on and during the ninety days prior to the Petition Date. 11 U.S.C. § 547(f). Section 547(g) places the burden of proving the avoidability of a transfer under Section 547(b) on the Trustee. *See* 11 U.S.C. § 547(g).

The Trustee challenges three transfers made or deemed made by the Debtor to ACC in the ninety days prior to the Petition Date as preferential and hence avoidable under Section 547(b). His first challenge runs to certain monetary transfers totaling $14,878.10. The other two challenges relate to the Oklahoma and Pennsylvania Trailers.

### 1. *Monetary Transfers*

■ Through his testimony and exhibits presented at trial, the Trustee established that while the Debtor was presumptively insolvent during the ninety days prior to the Petition Date, the Debtor "made" seven monetary transfers to ACC totaling $14,878.10. *See* Trustee's Exs. 10, 21. Al-though five checks are dated on August 31, 1998, which falls outside of the ninety day preference period, the transfers were made in the ninety days preceding the Petition Date because they were honored within the ninety day period. *See Barnhill v. Johnson,* 503 U.S. 393, 398, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992) (holding that the date a check is honored determines the date a transfer is made for purposes of 11 U.S.C. § 547(b)). The Trustee also established that each of these transfers was made on account of an antecedent debt. His testimony demonstrated that the payments were all made to pay off amounts the Debtor owed under six security agreements / conditional sale contracts between the Debtor and ACC. If these payments had not been made, ACC would have been able to assert a claim against the Debtor's estate. *See Virginia–Carolina Financial Corp.,* 954 F.2d at 197 (holding that a loan repayment is for or on account of an antecedent debt if the creditor would be able to assert a claim against the estate, absent the repayment.).

The Trustee has also satisfied the fifth and final element of a preferential transfer under Section 547(b). Section 547(b)(5) requires the Trustee to demonstrate that ACC received more money during the preference period than it would have received if (1) the transfer had not been made, (2) the case was a Chapter 7 proceeding, and (3) it received payment on its claims as provided for in the Bankruptcy Code. In essence, the court must compare what ACC received during the preference period with what it would have received if the case had been administered under Chapter 7 of the Bankruptcy Code. 5 COLLIER ON BANKRUPTCY P. 547.03[7] at 547–39 (15th rev. ed.2001).

■ The first step in this test is relatively straightforward. The court simply "returns" the Monetary Transfers to

the estate. The second and third parts of the test, determining how much ACC would have received in a Chapter 7 proceeding, are more complicated. First, the court must assign a value to the transfers and to the bankruptcy estate. This valuation must be made as of the time the Debtor filed its bankruptcy petition. *Palmer Clay Products Co. v. Brown,* 297 U.S. 227, 229, 56 S.Ct. 450, 80 L.Ed. 655 (1936); *see also Vogel v. Russell Transfer, Inc.,* 852 F.2d 797, 799 (4th Cir.1988) (noting that the relevant date for determination of preferences under Section 547 is the date of filing, notwithstanding an intervening conversion to Chapter 7). Next, the court must determine whether ACC would have been paid in full if the Debtor had originally filed a petition under Chapter 7 of the Bankruptcy Code. If ACC would have been paid in full, then there would be no preference. Finally, the court must compare the amount transferred from the Debtor to ACC to the amount the Creditor would have received in a hypothetical Chapter 7 liquidation. If the transfers allowed ACC to receive more than it would have received through the hypothetical liquidation, then the Trustee has satisfied Section 547(b)(5) and he may avoid the transfers.

■ As a matter of general principle, unless unsecured creditors will receive a one hundred percent distribution, an undersecured creditor who receives a payment during the preference period will receive more than it would have received under a Chapter 7 liquidation if the payment does not release a proportional amount of secured collateral. Here, the Trustee estimates he will recover approximately $172,000, which he will distribute to creditors holding over $1,000,000 in unsecured claims. *See* Trustee's Ex. 20 (Form 1). Consequently, unsecured creditors in this case will not receive a one hundred percent distribution.

As of the Petition Date, ACC was partially secured and partially unsecured. ACC was unsecured in the Oklahoma and Pennsylvania Trailers, and held perfected security interests in the Tractors. The only evidence of the value of the Tractors presented at trial were the security agreement / conditional sale contracts attached to a motion for relief from the automatic stay filed by ACC in March, 1999. These agreements priced the Tractors at $403,261.56. *See* Trustee's Ex. 1.

The next step is to determine whether, by virtue of the monetary transfers, ACC received more than it would have received under a hypothetical Chapter 7 liquidation. In its motion for relief from the automatic stay, ACC alleged the Debtor owed $554,690.64 plus attorney fees, interest and other expenses. *See* Trustee's Ex. 1. In a hypothetical liquidation, assuming the Trustee has avoided ACC's security interests in the Trailers, ACC would receive the Tractors valued at no more than their purchase price of $403,261.56, plus a percentage of its claim that is unsecured. At trial, ACC argued that the Trustee did not prove that this amount would be less than ACC received by virtue of the monetary transfers because the Trustee could not link specific transfers to specific debts owed by the Debtor to ACC. Therefore, ACC argued, it was just as likely the transfers were meant to pay off debt that was fully secured by ACC as it was that the transfers were used to pay off unsecured debt. As a result, the transfers may not have enabled ACC to receive more than it would have received in a Chapter 7 liquidation. ACC's argument is misplaced.

■ First, we must characterize the nature of ACC's claim or claims. The Debtor and ACC entered into six security agreements / conditional sale contracts.

On the Petition Date ACC held properly perfected security interests in the Tractors and unperfected security interests in the Oklahoma and Pennsylvania Trailers. The issue is whether ACC holds a single undersecured claim against the Debtor's estate to be divided into secured and unsecured claims pursuant to Section 506, or whether it instead holds separate claims for each of the six transactions between the Debtor and ACC, some of which are secured and some of which are unsecured. This distinction is significant because it will affect the ultimate decision. *See, e.g., Christison v. Morton Community Bank (In re Miller)*, 123 B.R. 46 (Bankr.C.D.Ill. 1991) (treating a mortgagee that held first and second mortgages on the debtors' property as holding two claims for purposes of preference analysis). If ACC holds separate claims, then it could at least argue that the transfers were made to pay off only the secured claims and that no preference resulted. If, on the other hand, ACC holds a single overall claim covering all of the debt but divided into secured and unsecured components, then there is a strong presumption that ACC applied the Monetary Transfers to the unsecured portion of its claim that can be rebutted only by a showing that ACC gave up at least an amount of its security interest on the Tractors equal to each payment.

In *In re Miller, supra*, the bankruptcy court looked to the underlying facts of the transactions between the bank and the debtors to determine that the single proof of claim filed by the bank actually included two claims. *Id.* at 47–48. The court noted that the loans were separate transactions made approximately two years apart, and that they involved separate notes and mortgages, with separate terms and conditions. The court also found that under non-bankruptcy law, each mortgage would have been treated as a separate obligation and would have had to be enforced through separate allegations or counts to show the default of each loan and the right to enforce each note and mortgage.

The underlying facts in this case paint a different picture. Although the Debtor and ACC entered into six different contracts with separate terms and conditions, each contract contained a "cross security" provision in which the Debtor granted ACC a security interest in the collateral such that the collateral described in the contract could be used to secure all present and after acquired obligations and liabilities of the Debtor to ACC.[10] In other words, all of ACC's financed vehicles stood as collateral for all of the Debtor's debts to ACC. As a result of this provision, for purposes of Section 547 the Debtor's obligation to ACC can only be described as a single overall claim, which Section 506 of the Bankruptcy Code then breaks down into a secured claim to the extent of the value of the Debtor's property securing the claim, and an unsecured claim to the extent the overall claim exceeds the value of their collateral. 11 U.S.C. §§ 506(a), (d); *Dewsnup v. Timm*, 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992).

On cross-examination of the Trustee, ACC established that the Trustee was un-

---

**10.** Paragraph N of the Security Agreements (Conditional Sale Contracts) provide:

N. *CROSS SECURITY*—Buyer grants to Seller a security interest in the Collateral to secure the payment and performance of all absolute and all contingent obligations and liabilities of Buyer to Seller, or to any assignee of Seller, now existing or hereafter arising, whether under this agreement or any other agreement and whether due directly or by assignment; provided, however, upon any assignment of this agreement by Seller, the assignee shall be deemed for the purpose of this paragraph the only party with a security interest in the Collateral.

able to allocate particular transfers to specific debts owed by the Debtor to ACC. ACC also attempted to show that the Debtor made several of the transfers on account of the Tractors, in which ACC held properly perfected security interests. However, because ACC only held a single undersecured claim, the Trustee's ability or inability to allocate specific transfers to specific debts has absolutely no impact on the court's analysis under 11 U.S.C. § 547(b)(5).

In *In re McCormick*, 5 B.R. 726 (Bankr. N.D.Ohio 1980), the bankruptcy court considered payments made to an undersecured creditor during the preference period. The creditor argued that the alleged preferential transfers were allocated to the secured portion of its claim. The court rejected this argument:

> The court must assume in the absence of proof to the contrary, that the payments were credited towards the unsecured portion of the debt, since this course of action would comport with standard business practice. Consequently one must conclude that [the partially undersecured creditor] received greater payment on its unsecured claim than other unsecured creditors and that the transaction satisfied the requirements of section 547(b)(5).

*Id.* at 729–30; *See also In re Barash v. Public Finance Corp.*, 658 F.2d 504 (7th Cir.1981) (expressly reaffirming the reasoning in *McCormick*); *Drabkin v. A.I. Credit Corp.*, 800 F.2d 1153, 1157 (D.C.Cir. 1986) (finding that the *McCormick* 'presumption' is properly treated as conclusive, not subject to rebuttal based on evidence of the parties' intent); *see also Small v. Williams*, 313 F.2d 39, 44 (4th Cir.1963) (implicitly acknowledging that undersecured creditors first apply payments to the unsecured portion of their claim: "The payment of the $4900, *of course,* was ap-

plied to the unsecured portion of his claim." (emphasis supplied)).

■ As a result of the monetary transfers, ACC received the full amount of the transfers, without giving up any interest in the Tractors in which it held perfected security interests. In addition, ACC will receive a percentage of its unsecured claim. This amount is greater than it would have received in a hypothetical Chapter 7 liquidation. Therefore, the Trustee may avoid the monetary transfers to ACC pursuant to 11 U.S.C. § 547.

### 2. *Trailers*

■ The Trustee also seeks to avoid ACC's security interest against the Oklahoma and Pennsylvania Trailers pursuant to 11 U.S.C. § 547(b), and to recover the value of the property sold by ACC postpetition. As urged by the Trustee, a prepetition transfer of a debtor's interest in property that is not perfected by the date of the debtor's bankruptcy filing is deemed to have taken place immediately before then. 11 U.S.C. § 547(e)(2)(C). Therefore, the transfer of the security interests in the trailers is deemed to have taken place on December 2, 1998, which was within ninety days before the Debtor's bankruptcy filing. The transfers were made while the Debtor was presumed insolvent and on account of an antecedent debt, namely, that created under the conditional sale contracts. Finally, the transfers preferred ACC over other creditors holding unsecured claims because they attached to fully secure the Debtor's debt to ACC. As the Trustee testified at trial, unsecured creditors are to receive only a pro rata payment from certain assets on account of their claims. Therefore, the Trustee is entitled to avoid the security interests on all eight trailers pursuant to Section 547(b).

### 3. *Defenses Raised by ACC*

■ Once the Trustee establishes that transfers constitute avoidable preferences under Section 547(b), the burden shifts to the transferee to demonstrate by a preponderance of the evidence that one of the exceptions to avoidance under Section 547(c) is applicable. *Trinkoff v. Porters Supply Co. (In re Daedalean, Inc.)*, 193 B.R. 204, 211 (Bankr.D.Md.1996). At the pleading and summary judgment stages, ACC raised two defenses to the Trustee's Section 547 action, including the ordinary course of business defense and the new value defense. *See.* 11 U.S.C. § 547(c)(2) (ordinary course of business defense), 11 U.S.C. § 547(c)(4) (new value defense). ACC was denied summary judgment on these issues because issues of material fact remained to be resolved. However, ACC neither raised nor argued these defenses at trial. Nor did ACC call any witnesses to testify. As a result, ACC has not sustained its burden of proof, and its asserted defenses fail.

### C. *Count III—11 U.S.C. § 549*

■ Section 549 of the Bankruptcy Code grants the Trustee the power to avoid post-petition transfers of property of the estate that are not authorized under Title 11 or by the court. 11 U.S.C. § 549(a). At trial, the Trustee testified and presented evidence showing that after the Petition Date, ACC re-titled the Pennsylvania Trailers in Missouri and took steps to perfect its liens on the Oklahoma Trailers. The Trustee contends that these post-petition acts are avoidable under Section 549. ACC bears the burden of proving their validity. Fed.R.Bankr.P. 6001.

ACC does not deny the Trustee's allegations, but instead counters that its actions were authorized by the court pursuant to the terms of the Consent Order. ACC's reliance on the Consent Order is misplaced for two reasons. First, the effect of the Consent Order is of no import, because even if ACC was authorized to perfect its security interests in the Trailers post-petition, its position is subordinate to the priority interest of the Chapter 7 Trustee under 11 U.S.C. § 544(a)(1).

Second, alternatively, the Consent Order did not expressly authorize the debtor-in-possession to make, or ACC to receive, a post-petition transfer of property of the bankruptcy estate free of the Trustee's rights under 11 U.S.C. § 549. By lifting the automatic stay the Consent Order authorized ACC "to exercise all of its rights under the Security Agreements and applicable non-bankruptcy law" that it possessed immediately before the automatic stay was imposed. If ACC's exercise of these rights included the improvement of its pre-petition position as ACC claims here, such improvement in position may have prevailed if this case was dismissed or the Trustee had not, in the exercise of his fiduciary discretion, pursued an avoidance action. However, merely granting relief from the automatic stay does not grant new rights to a creditor, and it does not immunize a creditor's actions to improve its position at the expense of the bankruptcy estate from scrutiny by a trustee or from a trustee's exercise of his or her avoidance powers. The Consent Order does not contain terms expressly waiving or terminating the Trustee's avoidance rights under 11 U.S.C. §§ 544, 547 or 549.

■ A debtor-in-possession's authority is constrained by its fiduciary responsibility to act in the best interest of the creditors of the estate, and not in its own interest. *In re Bowman*, 181 B.R. 836, 842 (Bankr.D.Md.1995) *citing In re J.T.R Corp.*, 958 F.2d 602, 604 (4th Cir. 1992). In addition, the debtor-in-possession's "job . . . is to make sure the credi-

tors are paid." *Id.* To accept ACC's interpretation of the Consent Order would require the court to find that the debtor-in-possession and ACC drafted, signed and allowed the court to improvidently approve an agreement that violated the debtor-in-possession's fiduciary duty and unfairly favored ACC over the interests of other creditors. To the extent there is any ambiguity in the terms of the Consent Order, the court will not resolve that ambiguity by interpreting the wording of the Consent Order as breaching the debtor-in-possession's fiduciary duty. As ACC did not present any evidence other than the Consent Order itself to support such a conclusion, it has not carried its burden of proof pursuant to Fed.R.Bankr.P. 6001. Therefore, the Trustee may avoid ACC's post-petition perfection of its security interests in the Pennsylvania and Oklahoma Trailers.

### D.  *11 U.S.C. § 550*

Section 550 of the Bankruptcy Code sets forth the transferees from whom a trustee may recover property where transfers have been avoided under Sections 544, 547, and 549. 11 U.S.C. § 550(a). Specifically, Section 550 provides that to the extent that a transfer is avoided under Sections 544, 547, and 549 of the Code, the trustee may recover the property or, if the court orders, the value of such property, from:

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

*Id.* The Trustee's power to recover from parties listed under subsection (a)(1) has been described at "absolute." *Bowers v. Atlanta Motor Speedway Inc. (In re Southeast Hotel Properties Ltd. Partnership),* 99 F.3d 151, 154 (4th Cir.1996).

In order to be an initial transferee, a party must exercise legal dominion and control over the property. *Id.* at 155. Physical possession of the property is not sufficient. *Id.* ACC qualifies as an initial transferee with respect to both the Monetary Transfers and the Oklahoma and Pennsylvania Trailers. When ACC received the transfers, it had the legal right to use the funds for its own purposes. ACC also exercised adequate dominion and control over the Trailers. It repossessed and sold the Oklahoma and Pennsylvania Trailers, and also retitled the Pennsylvania Trailers in Missouri. *See* Df.'s Exs. 25–28.

The Trustee may recover the value of the Monetary Transfers. Because ACC has sold the Oklahoma and Pennsylvania Trailers, the Trustee may also recover their value. The remaining issue is the value of the Trailers. Before trial, the Trustee filed a Motion to Compel ACC to provide information requested during discovery as to whom ACC sold the Trailers and at what price. The Trustee has represented, and ACC has not disputed, that ACC's counsel told the Trustee the vehicle files relating to the Trailers were lost, misplaced, or otherwise unavailable. *See* Dkt. 19, Mot. to Compel. The court does not accept that, even if the vehicle file for each of the Trailers was lost, ACC could not have obtained the information from secondary or third party sources with reasonable search or inquiry. It is well established that a party's failure to provide evidence peculiarly available to that party supports the inference that the truth would be damaging to that party. *United States v. Knox,* 68 F.3d 990, 1000 (7th Cir.1995); *Bicoastal Corp. v. Semi–Tech Microelectronics (Far East) Ltd. (In re Bicoastal Corp.),* 149 B.R. 212, 214 (Bankr. M.D.Fla.1992). Here, an appropriate remedy for ACC's failure to produce information peculiarly available to it is to find that

ACC sold the Trailers for their full retail value based on the best information supplied at trial, i.e. $19,500 each, or $156,000 in the aggregate. *See* Df.'s Ex. 20 (stating that retail and wholesale values of the vehicles as of October 31, 1998). October 31, 1998 is only slightly more than one month before the Petition Date; it is the best indication of value in the record for purposes of this proceeding; and it can be accepted as an admission against interest.

### E. *Interest*

 The Trustee also requests the award of prejudgment interest. The Fourth Circuit has ruled that it is within the discretion of the Bankruptcy Court to award prejudgment interest in avoidance actions, and that the interest is to be computed from the date of demand for the return of funds. *Sigmon v. Royal Cake Co. (In re Cybermech, Inc.)*, 13 F.3d 818, 822 (4th Cir.1994); *Selby v. Allfirst Bank (In re Selby)*, 254 B.R. 128, 132 (Bankr. D.Md.2000). The Trustee made demand on ACC for return of the transfers on November 15, 1999. An award of prejudgment interest is appropriate because the amount was liquidated and the Trustee was entitled to the recovery as a matter of law.

### VI. *Conclusion*

For the reasons set forth above, the court holds that ACC did not hold a perfected security interest in the Oklahoma or Pennsylvania Trailers as of the Petition Date. The Trustee may avoid Associates Commercial Corporation's liens on the Oklahoma and Pennsylvania Trailers pursuant to 11 U.S.C. §§ 544, 547 and 549. In addition, the Trustee may avoid the monetary transfers from the Debtor to Associates Commercial Corporation in the amount of $14,878.10 pursuant to 11 U.S.C. § 547. The court will grant judgment in favor of the Trustee against ACC in the amount of $170,878.10 pursuant to 11 U.S.C. § 550, $156,000.00 of which represents damages for the value of the eight Oklahoma and Pennsylvania Trailers and $14,878.10 of which represents the value of the avoided Monetary Transfers. Further, the Trustee will be granted prejudgment interest thereon from November 15, 1999.

An order and judgment in conformance with this Memorandum Opinion shall be issued separately.